## DOE EX DEM. KENNEDY'S EX'RS v. JONES.

1. Where, previous to the year 1800, the Spanish Governor of Louisiana, upon a petition praying the grant of a tract of land, directed the commandant at Mobile to put the petitioner in possession of the tract, and to forward the proceedings of survey, for the purpose of procuring the petitioner a title in due form: *Held*, that the concession of the Governor was a mere gratuitous assent to the prayer of the petition, and gave nothing more than a permission to occupy; the fee remained in Spain until the survey was made in due form, the fact communicated to the Governor, and the evidence of title furnished.

2. An inchoate grant by Spain, previous to the treaty of St. Ildefonso, only imposes upon the United States a political obligation to validate it so far as it is binding in conscience; but until it is confirmed, it confers upon the grantee no right which an American court will recognize. A confirmation by Spain subsequent to the treaty by which it yielded up its right to the soil, is wholly inoperative to affect the title of others, acquired after the original grant.

3. The dedication of a street in a town or city, may be inferred from public documents of an ancient date which refer to it as then existing, or from the deeds, or other papers of those who deny its existence.

4. Upon proof that a street was used as such, at a definite period, many years previous to the institution of the suit in which the question is involved, it may be inferred, in the absence of opposing proof, that it was dedicated to the use of the town, even before the time proved.

5. Where the streets of a town bordering on navigable water, are dedicated to the use of the town and the public, if there is no limitation, the dedication will extend across the shore to low water mark, as the shore may be reclaimed, or fill up by accretion, and become part of the town.

6. The transfer of the possession of Mobile and the adjacent country, from Spain to the United States, in 1813, did not interfere with the rights of property, the plan of the town, or the right of its inhabitants to use the public streets as they previously had done.

7. To perpetuate the dedication of streets, it is not necessary that there should have been a continuous corporate existence of the town.

8. The general rule, that the fee cannot remain in abeyance, does not apply, where property is dedicated to the public use, and where the object and purpose of the appropriation looks to a future grantee, in whom, or in which, the fee is to vest. The dedication will preclude the party making the appropriation from reasserting any right over the land, at least so long as it remains in public use, although there may never arise any grantee capable of taking the fee.

64                        ALABAMA.

Doe ex dem. Kennedy's Ex'rs v. Jones.

9. Although the fee of a street may be in an individual, is it not competent for the corporate authorities of the city, to cause to be erected, a wharf, or other convenience for the mooring or anchorage of vessels at the *terminus* of the street on navigable water, and demand wharfage and other kindred charges; and if this may be done by the corporation, may it not confer upon a third person, in consideration of a yearly rent, the privilege of making such erection, &c.

10. If land dedicated to the public has been used by a corporation for a purpose not contemplated in the dedication, will such an abuse of the right of use, invest the original proprietor of the fee with the right to the possession, so as to entitle him to maintain ejectment? Should not a court of equity be resorted to in such case, to compel the execution of the trust.

11. It is allowable to show on a trial at law, that a grant of land at Mobile, purporting to have been made by an officer of Spain, while that government was in possession of the country was unauthorized, and consequently void.

12. Where a commission for the examination of claims under Spanish grants, &c., makes a special report on a grant which is void, and an act of Congress is passed confirming the report, and providing for the location and survey of lands to which the title is thereby confirmed; but neither the report nor the act ascertained the limits or boundaries; in such case reference must be had, either to the survey made under the act, or to the patent consequent upon the survey, for the purpose of ascertaining the location of the land.

Appeal from the Circuit Court of Mobile.

This was an action of ejectment at the suit of the plaintiff in error, for the recovery of land thus described in the declaration, viz: "All that certain lot of ground covered with water, together with the wharf thereon erected, and the dock thereupon, with all the water privileges thereto appertaining, situate, lying and being in the city of Mobile, and county of Mobile, in front of, and east of St. Louis street, and between Commerce street and Mobile river, bounded on the south by property of William Jones, Jr., on the north by property of Joshua Kenndy, on the east by the channel of Mobile river, and on the west by Commerce street—being of the same width as St. Louis street extends; and commonly known as the wharf and dock at the foot of St. Louis street."

The defendant having pleaded *not guilty*, under the usual consent rule, the cause was tried by a jury, who returned a

verdict for the defendant, and judgment was rendered accordingly. On the trial, the plaintiff excepted to the ruling of the court. From the bill of exceptions it appears, that the plaintiff claimed the possession of a wharf built on piles in the water, immediately in front of St. Louis street, and commencing on the east side of the line of Front street, and extending into the river. The claim was made in virtue of a riparian right, and as appurtenant, or belonging to the proprietor of the soil bordering on the river. To make out the title, the plaintiff gave in evidence a grant called the "Price Grant," and proved the signatures of St. Maxent and other officers thereto, and read the same to the jury with the documents, map, &c. accompanying it; also, the records of the proceedings in the land office, the reports of the officers thereon, the patent certificate, with the certificate of survey, and the survey thereof, together with conveyances from Price to Wm. E. Kennedy, and from the latter to Joshua Kennedy, the lessor's testator—all which are made part of the bill of exceptions. The plaintiff also read to the jury the acts of Congress confirming the title sought to be established.

Evidence was also adduced by the plaintiff to show that Wm. E. Kennedy had obtained the possession of the land under the grant, and had transmitted the possession to the testator—having himself sold at different times certain portions of it. C. Delarge, a witness for the plaintiff, proved that St. Louis street was included in the "Price Grant," that the survey and patent included it; that the survey of the United States placed the boundary line a little south of St. Louis and a little west of Water street; that the front line is designated as the ancient margin of the river, but as late as 1819, the ordinary high tide at the place in question flowed further west, perhaps as much, or more, than one third of the space between Water and Royal streets. Witness further stated, that all the land between where the water then flowed, and where it now is, east of Front street, has been reclaimed by filling up at different times—the streets by the corporation, and the remainder by the proprietors of adjacent lots. In 1819 and 1824, the premises in question were covered with water, "and the land back of it, was open and vacant down to the water." It was proved that the wharf is

9

used as private. property, and would rent for about $2,000 a year.

The defendant claimed the wharf under a lease from the corporation, pursuant to a resolution of the Mayor and Aldermen of Mobile, a copy of which lease and resolution are made part of the bill of exceptions. The wharf, as well as one previously erected, were built by the defendant under the lease. Before that time there was only a mud flat, or marsh in front of the street. As the foundation of the title of the corporation, the act of Congress of 1824, granting the front to the city was read; and the defendant further claimed under the right of the city acquired by the dedication of the street to public use.

To prove that St. Louis street was a street of Mobile, under the government of Spain, offered in evidence, deeds and Spanish records, copies of which are attached to the bill of exceptions. He also gave in evidence a map of the city, and of the lands of Joshua and Wm. E. Kennedy, made at their instance in 1817, or 1818, by one Matthews, a surveyor, which map was held and recognized by them, and by it they sold lots. St. Louis street is laid down on the map, and projected in the water as well as on the land. He further proved, that they sold lots bounded on streets laid down on that map, in 1818, and after that time on St. Louis street; but it did not appear that they sold any on the last named street below Royal street till 1835. No witness deposed that St. Louis street existed, or was used or known while Mobile was under the government of Spain, between Royal street and the river; the only witness examined to that point, testified, that St. Louis street, under the Spanish government, existed between Royal and St. Joseph streets; that down to the time the United States took possession of the country, it was only a narrow lane or street, and that east of Royal street it had no existence—that place being an open common. The defendant however relied on the records to show that St. Louis street was a public street, known to the public officers and recognized as such by Spain.

The defendant next offered in evidence a map made by Goodwin and Hayne, as surveyors of the city, and proved that it was adopted by the corporation in 1825, as the official map. A copy of which is annexed to the bill of excep-

tions, and on it Church, St. Louis, Congress and Adams streets are projected ; but there is none designated as "North Boundary street." It was also shown, by the records of the corporation, copies of which are attached, that it had made large expenditures of money for filling up the streets.

Water street was filled up at the point where St. Louis street reaches it, so as to exclude the water, in 1828, and from that point east, St. Louis was afterwards reclaimed ; *further*, Commerce, Front and St. Louis streets were filled up to the river, by the corporation, as other streets were. As St. Louis was thus reclaimed, it was extended to the river, "and used as a street until the wharf was built, joining Front street where it now is."

The defendants then offered transcripts from the land office, reports of commissioners, &c. for the purpose of showing that the grant to Price was fraudulent, and not made in fact by the Spanish officers at the time it purports, nor while they were in office—all which are made part of the record in this cause. " The actual terms and survey of the Price grant and the patent," does not embrace the property now sued for.

Upon the evidence recited, the court charged the jury— 1. If they believed that St. Louis street had been dedicated and established under the government of Spain as a public street, and was so recognized previous to the treaty with France, by which Louisiana was acquired and that it extended to the river Mobile, then the fee of the street would be in the public, for the use of the city, that all riparian rights in front of that street would belong to the city, that the corporation of Mobile would succeed to the Spanish town, and the city was entitled to the fee in the land. *Further*, the extension of the street to the river, from time to time, after the change of flags, would not prevent the corporation from holding by the same right ; the riparian right would belong to the street, and the city, and the plaintiff could not claim it. That they might consider of the evidence before them—it was competent to show that such dedication existed, and that it was a public street under the Spanish government. 2. It was competent for the defendant to show, that the Spanish grant to Price was fraudulent, as having been made by the Kennedys, or others not in authority ; they

might take the documentary proof referred to, into their consideration, and if from that evidence they believed it fradulent, the plaintiff's title " would be limited by that granted to him by the United States patent." 3. If they believed the Spanish grant to be fraudulent, it was void; and in such case the plaintiff was not entitled to recover, as he could claim no riparian rights under the confirmation by Congress —his rights thereby were limited by the description in his patent from the United States, which does not make the river his boundary.

A. F. HOPKINS and G. N. STEWART for the appellants. A riparian proprietor has the right of extending improvements across the shore of navigable water, if they are beneficial to the public, and not injurious to the navigation. The right to embank, at common law, belongs to the adjacent proprietor. [Ang. on Tide Waters, 131, 134, 150, 158, 159, 160.] He has an unquestionable right to the water boundary, and no one else can exclude him by making embankments. [Id. 162; 8 Port. Rep. 34; 3 Ala. R. 294.]

The right of property which the State has in the shore, and in land covered by navigable water, can only be used as a protection against an occupation which would be injurious to the public. [Ang. on Tide Waters, 161; 3 Ala. Rep. 294.] It has been dedicated to the use of the people of the United States, and of this State, and neither can grant any right in the same. [9 Porter's Rep. 590, et post; 8 Id. 34; 3 Ala. R. 294; 3 How. Rep. (U. S.) 212.] The soil used for a street may, by the common law, be dedicated to that purpose; and the dedication may be inferred from the public use, and the acts and acquiesence of the owner. [6 Pet. Rep. 439; 3 Bing. R. 447.] But a dedication by the owner of the fee, would confer no right on the corporation to the fee of the soil; in respect to such a street its rights would be the same as if it had been opened in the exercise of corporate powers, and no greater. In the present case, the corporation has taken a part of the shore which we have seen was otherwise disposed of by the compact between the United States and this State—this act was clearly unauthorized, and violative of other rights. The State could not confer such a power.

Doe ex dem. Kennedy's Ex'rs v. Jones.

A riparian proprietor has a vested right to go to the water, and neither the United States, or the State, can exclude him from it, by making wharves, &c. [8 Porter's Rep. 34; Ang. on Tide Waters, 161-2.] The fee in the soil of a highway belongs to him who would have been its proprietor, if it never had been thus appropriated. [6 East's Rep. 154; 1 Burr. Rep. 134, 143; 1 Wils. Rep. 7; 8 Porter's Rep. 33; 2 Mass. R. 127; 2 Johns. R. 363; 15 Id. 447.] And the law is the same, though the ground was covered with navigable water until it was used as a highway. [7 Metc. R. 39; 1 Sumn. R. 21.] If, when St. Louis street was dedicated to the public, in 1817, or 1818, the Kennedy's had parted with their right to all the adjacent land, perhaps, they would have no claim to the fee of the soil of the street; but this is denied. The proof however shows, that they retained, and their representatives still are proprietors of the adjoining lands. The cases cited by defendant's counsel from 4 Mart. Rep. 97; 4 Wend. Rep. 22, do not conflict with the view taken by the plaintiff. [See 6 Pet. Rep. 431, 498.] Although the use of the soil may be shown to belong to the public by dedication, yet the fee could not be transferred according to the Spanish law, otherwise than by grant. [10 Pet. Rep. 723.]

It does not appear when St. Louis and other streets were opened—if it was previous to the treaty of St. Ildefonso, then the United States would have acquired the fee subject to the easement; and the confirmation of the title to Joshua Kennedy, would have transferred it to him. There was no proof of any grant by Spain, of St. Louis street to the city, as property. The concession made to Collins in 1803, calls for that street as one of its boundaries—but this was a grant to an individual, and not to the city. In 1813, when the Spanish government ceased to exist at Mobile, St. Louis did not extend east of Royal street; even as late as 1824, the tide flowed half way from water to Royal street. If the land granted to Collins could be identified by other objects, the grant would not be void for uncertainty; but if the Spanish government made a grant to the city, of St. Louis street, without any description of the course of it, or of any thing else to identify it, the grant would be void for want of pow-

er in the government to grant the fee of the soil, as well as for uncertainty. [10 Pet. Rep. 331; Id. 182.] The recital in a deed from Wm. E. Kennedy to Innerarity, for one half his interest in the Baudin claim, which was a Spanish concession, made in 1798, that it was bounded by St. Louis street, does not prove the existence of the street at that time; but merely referred to it as it existed at the date of the deed, in 1820. If, however, the recital affirmed the existence of the street in 1798, it would prove nothing; for the uncertainty of its location made it impossible to identify it, except as to the distance from St. Josephs to Royal streets—and then only by a reference to other objects. After the treaty of St. Ildefonso, Spain could not grant the fee in Mobile, or dedicate the soil to a street; there is no proof of a perfect grant having been previously made, and if there was an incomplete one, or a mere easement, it should have been presented for examination according to the acts of Congress, and confirmed, to entitle it to be considered as evidence. [12 Pet. 454; 3 How. Rep. U. S. 55; 2 How. R. 603, 351; 6 Pet. R. 513.]

St. Louis street, up to 1817, or 1818, when Matthews drew the map for the Kennedy's, was only used from St. Joseph's to Royal street—and it was at that time, and in that manner, that the first dedication was made of it east to the river. Subsequent to 1798, when the grant to Price was made, the Spanish government could not have made a valid dedication, because the soil was granted to Price.

In 1814, the town of Mobile surrendered her corporate powers derived from Spain, and if she previously had the capacity to hold the soil of streets in fee, she then yielded it up, and retained nothing more than an easement. The fee from that time, if indeed the corporation held it, was abandoned to the United States to be sold or transferred by confirmation, as other parts of the public domain.

A title derived from the United States cannot be impeached at law where the Government had a right to grant and the officer who issued the patent was authorized to issue it. [9 Cranch's Rep. 99; 13 Pet. Rep. 436; 2 How. Rep. U. S. 318; 3 Ala. Rep. 47.] In the case cited by the defendant's counsel from 2 How Rep. U. S. 597, the court gave no opin-

ion upon the point whether it could be shown against the confirmation of a complete Spanish grant that it had been fraudulently obtained. A confirmation by Congress admits that the equitable title was valid, was created at the time it imports, and was held by the United States or Spain in trust for the person entitled to the equity. [12 Pet. Rep. 484; 2 How. Rep. U. S. 344; 7 Ala. Rep. 900.] The patent then to Kennedy and the survey, as they bound the land according to the Spanish grant and plat, give him a legal claim to all the riparian rights to which he would have been entitled, if that grant had conveyed both the legal and equitable estate. One of the boundaries was the river Mobile, and this carries with it all accretions from the receding of the water; the more especially as the confirmation occurred before the United States had granted any of the land included within the grant by Spain. [See 5 Ala. Rep. 392.]

The confirmation to Kennedy is retrospective, and gives him all the rights to which the Spanish grant would have entitled him had it conveyed a perfect title in itself. [3 How. Rep. 57; 7 Ala. Rep. 900.] The act of Congress of 1824 conferred no right upon the city to the premises in question, and thus far is void. [3 Ala. Rep. 51; 3 How. R. U. S. 212.] *Besides*, the claim of Kennedy is by the terms of the act excepted from its influence. [16 Peters' R. 263.]

We may consider the confirmation of Kennedy's title not only as a legislative grant, but an act of Congress. [7 Ala. Rep. 900; 6 Cranch's Rep. 88; 2 How. Rep. U. S. 372; 3 id. 57;] and it cannot be enlarged or restricted by the patent and survey consequent upon it. If these embrace too much land, they will be *merely void as to the excess;* if they do not include enough, the grantee's rights will not be affected. [8 Ala. Rep. 930.]

Questions arising upon the presentment of an incomplete Spanish grant for investigation with a view to confirmation, however decided, are not regarded as definitively settled, unless they are adjudicated by some court invested with the right of decision in the particular case. But Congress, in virtue of the political obligations of the Government, may examine all the evidence and act finally upon it—whatever be its conclusion, it is not revisable by any tribunal. [2 Pet.

72 ALABAMA.

Doe ex dem. Kennedy's Ex'rs v. Jones.

Rep. 307; 6 id. 735; 7 id. 240; 10 id. 326; 2 How. Rep. U. S. 345; 3 id. 706, 751, 761.] Congress, in the exercise of the duties devolved upon it by the treaty, has confirmed the "Price Grant," and thus placed it beyond its power to annul or impair the confirmation quite as much as if it had been recognized by the treaty itself. [2 Stew. Rep. 413; 5 S. & P. Rep. 40; 1 Ala. Rep. 660.]

Complete Spanish grants, not expressly confirmed by the treaty, confer rights which are protected by the treaty and the law of nations; and when such rights are asserted against the United States, by one holding under the United States, or another complete grant, it is permissible to resist them by proof that the grant was fraudulent only in the same manner that patents from the Government may be assailed. The case cited from 3 How. Rep. U. S. 762, 787, to show that the invalidity of an incomplete Spanish grant may be inquired into after confirmation, was a case in which the United States had never confirmed the grant.

The circuit court erred in referring to the jury the inquiry whether there was a grant of St. Louis street, or a dedication of it to the city by Spain. [4 Porter's Rep. 331.]

J. A. CAMPBELL, for the defendant in error. Some of the ancient writers on the civil law teach, that, if an alluvion is formed upon the edge of a public road, it belongs to the proprietor who is separated from the river by the road. But this rule, if it obtained any where, proceeded upon the ground that the repair and support of public roads were at the charge of those through whose lands they passed; so that, if a portion became impassable or was destroyed by water, the contiguous proprietor was bound to furnish from his domain the land necessary for a passage—it was just, as the owner was subjected to the inconvenience, that the benefits of a riparian proprietor should be secured to him. Where public roads are on ground purchased of the proprietors, or the adjacent land holden is not chargeable with their repair, the law is said to be otherwise. [*Chardon droit d'Alluvion*, 264, *et seq.*] Who has opened St. Louis street and improved it? Who is bound to continue it in a passable condition, and whose loss would it be, if injured by an irruption from the river? An

Doe ex dem. Kennedy's Ex'rs v. Jones.

answer to these questions will show that the dedication of a street in a growing city is to place it under the municipal authority, to be used according to a sound discretion for the public benefit. Has the city in the present instance abused or unwisely exercised its power? Unless the lease had been given, it is probable the improvement could not have been made. Was it not a matter proper for the Mayor and Aldermen of the city to consider whether they should allow the *locus* of the street to remain a marsh, or to have it filled up, and grant a water privilege. The 566th article of the code declares that one whose land is separated from the bank of navigable water by a public road shall. profit by alluvion. This we have seen was the Roman law, founded upon reasons already stated, and which do not obtain here. In France it is said that the *state* or *commune* who have need of a road.are obliged to purchase and pay for the lands needful, and it thus becomes their property; the alluvion formed on the opposite side from the private proprietor belongs to the *state* or *commune*, which suffers from the inconvenience incident to a boundary upon a water course, from inundation, &c. [1 Gornier, regime des eaux, 240.]

The city of Mobile is occupied by those who succeeded to the estates of the Spanish inhabitants; whatever had been dedicated to the use of the people residing in the Spanish town, devolved upon the American city. [See Toulm. Dig. of Ala. 780-1, 791.] The evidence of St. Louis street consists of records of more than forty years' standing, referring to the street as then in existence—with these the Kennedys are directly connected, as claiming under them and describing them. Old deeds made, calling for this street as a boundary, were also adduced, together with a map made by the Kennedys twenty years before the institution of this suit, and proof that the corporation made improvements on the street as early as 1822. In 1824 an act of the Legislature was passed which established a map of the city, on which St. Louis street is noted—in 1830 the street was extended and enlarged, and in consideration thereof, the lease to the defendant was executed, under which he enjoyed without molestation up to the close of 1837. The jury have

found that this street was dedicated to the public prior to 1800; and this we have seen was sufficient to entitle the corporation to the alluvial formations according to the French and Spanish laws. [4 Mart. Rep. 97; 10 Pet. Rep. 723 *et seq.*]

The plaintiff concedes that he has no claim on the street, and submits to the evidence of dedication as conclusive against the title of his lessor. We deny, then, that any infringement of the *public right* by the defendant can entitle the plaintiff to divest that right entirely; if we use or abuse it, the public can complain. [6 Wend. Rep. 651; 19 Pick. Rep. 445; 6 Pet. Rep. 431, 498; 10 id. 662, 723; 4 Mart. Rep. 97.] The use of the street merely to sustain a wharf is not an infringement of the public right to the street. [4 Wend. Rep. 9; 6 Pet. Rep. 498.] In 18 Louisiana R. 278, it is said that the use of the batture outside of the levee is vested in the public, but the ownership or title to the soil is vested in the proprietors of the front lots, or the land to which the batture attaches or forms. That the corporation or municipality is the administrator of the *use* of the *batture* for the public, outside of the levee, and have the right of taking earth for the construction of embankments, levees and wharves for the public use, on the batture along its whole extent within the corporate limits of the city; and also for improving the port and the streets and avenues leading to it. The city of Mobile has the power to regulate the *mooring and anchorage of vessels*, and to widen, extend and regulate the streets, lanes and alleys. Here is an ample authority to make the lease to the defendant; and the declaration shows the character of the property, which the plaintiffs are seeking to recover.

In the City Council of Lafayette v. Holland and others, 18 Louis. Rep. 286, it was decided, where the plan of a faubourg exhibits a front street called "Levee street," running parallel with the Levee, but leaving a space between on which no specified number of feet are marked, and without any particular designation on the plan, it will be presumed to be dedicated to the *public use*, and required to be kept open and free for that purpose. The circuit court in the case at bar ruled that under the American law, the erection of a

wharf entitled the owners of the fee in the street to maintain ejectment; but according to the Spanish law, the action was maintainable: hence it is, that the question is presented as a dedication made prior to 1800. But the record shows that at the termination of a public street a wharf has been erected under the authority of the corporation, and we think it has been shown that a wharf built under such circumstances cannot be recovered by one who has dedicated the street.

In the Mayor of New Orleans v. Metzinger, 3 Mart. Rep. 296, it is considered a clear principle of law that public places, such as roads and streets, cannot be appropriated to private use; and there was no doubt, that, if the Government which was the previous proprietor of Louisiana had given away such places to individuals, such grants might be declared void.

The confirmation to Kennedy only passed the interest which the United States had in the land in 1829—previous to that time the United States had parted with its right in the shore to this State, and the corporation of Mobile. Such a confirmation was inoperative as it respects the property in question. [2 How. Rep. 34; 7 Ala. Rep. 554, 882; 2 id. 909, 930.] It expressly excepts all pre-existing titles, and the city of Mobile is in a situation to contest the plaintiff's right—asserting as it does, a title under the act of Congress of 1824, and by dedication from Spain, which comes within the exception. [9 Cranch's Rep. 87; 11 Wheat. Rep. 380; 2 How. U. S. Rep. 591; 3 id. 773; 9 Pet. Rep. 225; 8 Por. Rep. 9.]

The patent from the United States is conclusive as to the extent of the land to which the plaintiffs' lessors are entitled. The confirmatory act gives the authority to the register and receiver to locate and survey, and authorizes a patent to issue. This perhaps might not be obligatory if the lands had been surveyed under Spanish authority, and could be identified. If, however, the grantee submits to the survey and location, and takes from the United States a grant according to that survey and location, he is estopped from claiming a different boundary. Here the patent was offered as a muniment of title, thus admitting that it correctly described the land. [7 Johns. Rep. 242; 12 Johns. Rep. 357; 17 Johns.

Rep. 29; 12 Wend. Rep. 44, 59; 23 Pick. Rep. 91; 3 How. Rep. U. S. 773; 2 Hill's Rep. N. Y. 219; 13 Excheq. Rep. —; 6 Ala. Rep. 738; 4 Cond. Louis. Rep. 650; 13 Pet. R. 490.]

Upon the body of the testimony showing a connected series of recognitions extending back forty years previous to the trial, a dedication of the street may be fairly inferred. In such cases, especially of long standing, great latitude is allowed in making proof. [1 Greenl. Ev. 166; 6 Pet. Rep. 328; 7 id. 554.]

In respect to the argument for the plaintiff in error, it may be first remarked, that the validity and existence of the grant was admitted in the Mayor, &c. v. Hallett, 16 Pet. Rep., and that the only question there decided is, that a grantee under the Government of Spain has a better title than the corporation under the act of 1824. The assumption that the confirmation is an acknowledgement that the grantee has a good title, even from its incipiency, and completes it just as if it had been perfect by the act of the preceding Government, must be received with much restriction. [7 Ala. Rep. 882; 8 id. 930.] It is only true upon the concession that the land remains the property of the United States, and the confirmation is absolute and unconditional. In the present case, the property had passed from the Federal Government by the admission of Alabama into the Union, and by the act of 1824.

It is a matter of no consequence whether the United States could grant the land covered by the shore or not—both parties derive title from the same source, and each must be held to have admitted the title of their common grantor. [8 Ala. Rep. 930.]

The argument that the dedication of a street to the city of Mobile would be void for uncertainty, cannot be supported. It is competent to establish the boundaries of a private lot by the deeds of adjacent proprietors, and much more so the location of public property. [6 Pick. Rep. 158; 6 Pet. Rep. 328; 7 id. 554; 8 Ala. Rep. 279.] The fact that the street was not open is no objection to its dedication. Matthews' Map lays down the street; besides, in a city more than one hundred years old, its existence may be presumed

for an indefinite period, and this presumption is strengthened by the other evidence in the cause. [See 10 Pet. Rep. 723.]

We have seen that the title set up by the plaintiff, was not confirmed until 1829, five years after the passage of the act of Congress in favor of the city; that the confirmation was a mere relinquishment of the claim of the United States, and · could not so operate as to impair any previous enactment: *Further*, that the boundaries must be as defined by the patent and survey, which are consequential to the relinquishment by the government, and that the Spanish grant to Price is not validated *ab initio*. [See 8 Ala. Rep. 909, 930.]

It was allowable to attack the grant by Spain, either for ·fraud, or because it was made by one who had no authority as an officer to make it. [9 Cranch's Rep. 87; 11 Wheat. R. 380; 3 How. Rep. 773.] In conclusion, the defendant's counsel remarked, that the acts· of Congress which give effect to Spanish grants, were expressed in different terms, according to the character of the grant—complete grants were recognized, incomplete ones were confirmed, either absolutely or conditionally. The confirmation of the "Price grant" was conditional. [7 Ala. Rep. 882.]

COLLIER, C. J.—On the 19th April, 1798, Thomas Price, the English interpreter residing at Mobile, petitioned Manuel Gayoso de Lemos, the Spanish Governor of Louisiana, for a tract of land having twenty arpens in front, by thirty in depth, bounded on the north by lands anciently the property of Terry and Mazurie; on the east by the granted lots in the town of Mobile, and by the river, and on the west and south by vacant lands. In aid of Price's petition, Manuel de Lanzos, the then commandant of Mobile, informed the Governor that the land thus applied for was vacant, the petitioner was a useful person, had been for several years English interpreter, and that there was no obstacle to his having a grant of the land. Thereupon the Governor, by a decree dated at New Orleans, the 18th November, 1798, directed the commandant to put the petitioner in possession of the tract, and to forward the proceedings of survey, for the purpose of procuring the petitioner a title in due form.

It is not shown that any further proceedings were had on

78 . ALABAMA.

Doe ex dom. Kennedy's Ex'rs v. Jones.

the petition. In 1806, Price, through his agent, Joshua Kennedy, presented to Morales, the Intendant of Pensacola, a petition for five hundred arpens of land, in and contiguous to and within the then town of Mobile. Sometime afterwards, Price discovering his agent was mistaken as to the particular land desired, as well as to the terms on which he wished a grant of it, addressed a memorial to the commandant at Mobile, stating in what the mistake consisted : *Further*, that the Intendancy had granted out of the six hundred arpens conceded to him by De Lemos, a tract of twenty arpens to Wm. McBoy, and had also granted to F. Collell part of another tract belonging to the memorialist. Thereupon Price prayed a confirmation of the concession of 1798, and that five hundred arpens, lying to the south and west thereof, might be granted to him in payment of three years salary, due him as interpreter, and as compensation for the injury he had sustained by the grants to McBoy and Collell. The prayer of the petitioner was granted, on condition that he should never claim the lands held by McBoy and Collell, and his claim upon the treasury for his salary should be considered as extinguished. The Spanish surveyor general, Pintado, in his directions to the deputy at Mobile, recapitulates this latter concession to Price, approved the same, and ordered him to have a survey made, that a formal title might issue. [Am. State Pap. 5 Public Lands, 128.]

These facts, with others not necessary to be noticed, are set forth in "Special report No. 1," of the register and receiver of the land office for the district of St. Stephens, to the secretary of the treasury, on the 23d February, 1828. By an act of Congress of the 2d March, 1830, all claims to lands and town lots contained in certain abstracts reported to the treasury department by that register and receiver, under the provisions of the act of Congress of 1827, are confirmed to the extent therein recommended : *Further*, "that all the claims contained in special reports, numbered one to four inclusive, and in a supplementary report of the said register and receiver, made as aforesaid, be, and the same are hereby confirmed." The fourth section enacts, "that the confirmation of all claims provided for by this act, shall amount only to a relinquishment forever on the part of the United

States, of any claim whatever to the tracts of land and town lots so confirmed, and that nothing herein contained shall be construed to affect the claim or claims of any individual, or body politic or corporate, if any such there be." It is provided by the fifth section, that the register and receiver at St. Stephens shall direct the manner in which all claims to lands and town lots in their district confirmed by this and former acts of Congress, shall be located and surveyed, having regard to the laws, usages and customs of the Spanish government on that subject, and also the mode adopted by the government of the United States, in surveying the claims confirmed by virtue of the second and third sections of an act of Congress, entitled "an act regulating the grant of lands, and providing for the disposal of the lands of the United States, south of the State of Tennessee," approved the 3d of March, 1803; and that so much of the fourth section of the "act supplementary to the several acts for adjusting the claims to land, and establishing land offices in the district east of the island of New Orleans," approved the 8th of May, 1822, as interferes with the power here granted to the register and receiver of the land office at St. Stephens, is hereby repealed. [Public Lands, ed. 1838, Part 1, p. 455.]

The proceedings upon Price's petition, in 1798, merely direct the commandant of Mobile to put the petitioner into possession and to forward the survey, that the title may be consummated. It does not appear that the survey was ever made, or that any further steps were ever taken to perfect his title until 1806. These proceedings then, were wholly ineffectual in 1800, when Spain relinquished her claim to the country west of the Perdido, and when it was subsequently acquired by the United States, under the treaty of Paris. It may be added that the concession by the Governor of Louisiana, was a mere gratuitous assent to the prayer of the petition, and gave nothing more than a permission to occupy the lands—the fee remaining in Spain, until the survey was made in due form, the fact communicated to the Governor, and the evidence of title furnished.

Previous to 1806, the United States had become the proprietor of Mobile, when the concession of 1798 was professedly confirmed. But even this latter act, though founded

avowedly upon a consideration, did not complete the title—
it contemplated a survey as a prerequisite to its consumma-
tion, and it does not appear to have been made, or that the
Spanish authorities acted further in the matter.    In this con-
dition of things, the United States become the owner of the
fee in the lands in question, under the treaty of Paris charg-
ed with a political obligation to validate the inchoate acts of
the Spanish government, so far as they were binding in con-
science.    Price had no rights which an American court could
recognize, but was dependent upon the bounty and justice of
Congress for the establishment of his claim.    These princi-
ples have been so often asserted both by this and other courts,
that it cannot be necessary now to sustain them by a refer-
ence to authority.

If, in the *interim*, when Price's petition was acted on by
the Governor of Louisiana, and the negotiation of the treaty
of St. Ildefonso, in 1800, Spain had made a complete grant
of the same land, it cannot be questioned but the grantee
would have acquired a title paramount to the concession to
Price.    The bounty which the representatives of his Catho-
lic Majesty, had undertaken to bestow, could have been with-
drawn before his purpose was consummated.    This being
the case, conceding that the evidence does not show a dedi-
cation of the soil of St. Louis street to the use of the city,
prior to 1798, or that the circuit court did not refer that ques-
tion to the jury, and it may be asked whether it was not
competent, subsequent to that period, for the Spanish autho-
rities to dedicate to public purposes any part of the land em-
braced by Price's claim ?    This question, we think, must re-
ceive an affirmative answer.    If such a dedication was made
previous to 1806, the confirmation of the commandant at Mo-
bile, does not abrogate it in express terms, or by a reasona-
ble construction, even if it had been within the competency of
the local authorities of Spain to grant a public highway, or
to divest easements in which the town had a common inter-
est.    But we have said that the concession of 1806 was in-
choate, and not entitled to judicial recognition until it was
confirmed by Congress.

In the Mayor, &c. of New Orleans v. Metzinger, 3 Mart.
Rep. 296, the defendant claimed a lot in the city of New Or-

leans under a perfect Spanish grant which had been recognized by the United States, which the plaintiffs insisted was part of the public highway, and therefore could not have been granted for private use, even by the king himself. The court said, " that public places, such as roads and streets cannot be appropriated to private use, is one of those principles of public law, which requires not the support of much argument. Nor is there any doubt, that if by a stretch of arbitrary power, the preceding government had given away such places to individuals, such grants might be declared void." This decision is expressed in terms too explicit to require comment, and was made by a court in which the civil law, as applied in Spain, is recognized.

It has frequently been a question, both in England and this country, what is sufficient to constitute a dedication of land to the public use. In Jarvis v. Dean, 3 Bing. R. 447, it appeared that persons had for four or five years been in the habit of passing up and down a new, unpaved and unfinished street, which terminated in fields, where other houses were built. The jury affirmed by their verdict a dedication of the street to the public, and a new trial was moved for on the ground that there was not sufficient evidence to support it. It was said by the court of common pleas, that as the street " had been used for four or five years as a public road, the jury were warranted in presuming that it was used with the full assent of the owners of the soil ;" consequently the motion was denied. See also, Antones, et al. v. Heirs of Eslava, 9 Porter's Rep. 527.

In the President, &c. of the city of Cincinnati v. The Lessee of White, 6 Pet. Rep. 431, the proprietors of the land on which the city has been erected, made and approved a plan of a town, on which certain ground was designated as a common for the use and benefit of the town forever, reserving only the right of a ferry. It was held that the right of the public to use the common in Cincinnati, must rest on the same principles as the right to use the streets ; and that the dedication made when the town was laid out, gave a valid and indefeasible title to the city of Cincinnati: *Further,*

11

there is no particular form or ceremony necessary in the dedication of land to public use. All that is required is the assent of the owner of the land, and the fact of its being used for the public purposes intended by the appropriation.

It was said, that in such cases there may be instances where, contrary to the "general rule, a fee may remain in abeyance until there is a grantee capable of taking, when the object and purpose of the appropriation looks to the future grantee in which the fee is to vest. But the validity of a dedication does not depend on this: it will preclude the party making the appropriation from reasserting any right over the land; at all events, so long as it remains in public use, although there may never arise any grantee capable of taking the fee. All public dedications must be considered with reference to the use for which they are made; and streets in a town or city may require a more enlarged use of the land, in order to carry into effect the purposes intended, than may be necessary in an appropriation for a highway in the country. But the principle, so far as respects the right of the original owner to disturb the use, must rest on the same ground in both cases; and applies equally to the dedication of the common as to the streets. Property being thus set apart for public use, and enjoyed as such, and private rights acquired with reference to it, the law considers it in the nature of an estoppel *in pais*, which precludes the original owner from revoking such dedication. It is a violation of good faith to the public, and those who have acquired private property, with a view to the enjoyment of the use thus publicly granted.

The same doctrine is reasserted in Barclay and others v. Howell's Lessee, 6 Pet. Rep. 498, where it was also said, if the ground for which an action of ejectment is brought had been dedicated for a particular purpose in a city, and the corporate authorities appropriated it to an entirely different purpose, it might afford ground for the interference of a court of chancery, to compel a specific execution of the trust, by restraining the corporation, or by causing the removal of obstructions. But even in such a case, the property dedicated would not revert to the original owner. The use would still remain in the public, limited only by the condition imposed

in the grant. *Further*, an unmolested possession for thirty years, would authorize the presumption of a grant; and under some circumstances, a grant has been presumed from a possession short of the number of years required to bar the action of ejectment, by the statute of limitations. In some cases, a dedication of property to public use, as, for instance, a street or a road, has been inferred from an undisturbed use of it by the public for six or seven years. See also, McConnell v. The Trustees of the Town of Lexington, 12 Wheat. Rep. 582.

In Renthorp, et al. v. Bourg, et ux, 4 Mart. Rep. 97, it was conceded, that according to the common law, the owner of a tract of land over which a public road passes, retains the fee in the soil, the use of the road is in the public; but it was said, that the Roman law invested the public with a right to the ground itself, that this law is in force in France, was so in Louisiana, when the country passed under the dominion of Spain, and does not appear to have been modified by the latter monarchy. See also, 6 Pet. Rep. *ut supra*, 499.

It has been held, that in order to dedicate property for public use in cities, towns, and other places, it is not essential that the right to use the same shall be vested in a corporate body—it may exist in the public, and have no other limitation than the wants of the community at large. If buildings have been erected on lands within the space dedicated for public use, or grants of part of the same have been made by the power which had authority to make, and had made, a dedication of the same to public use; the erection of the buildings, and the making of the grants, would not disprove the dedication, nor would the vested rights of the public be affected by the grants. It would be a dangerous doctrine to consider the issuing of a grant as conclusive evidence of a right in the power which issued it. For any thing appearing to the contrary on its face, it may be valid; but if the thing granted was not in the grantor, no right passed to the grantee. [The Mayor, &c. of New Orleans v. The United States, 10 Pet. Rep. 662.]

In the case before us, it does not appear whether St. Louis street was designated in the original plan of the Spanish town, Mobile, or whether it was dedicated by Spain, or some

individual proprietor of the land over which it passes, but it is described in a petition of Joseph Collins, dated in January, 1803, addressed to Orsono, the then commandant at Mobile, praying a grant of a tract of land, as one of the streets of•the town. And Orsono in answer to this petition gives permission to Collins to occupy land on the flat, of which "St. Louis street" is described as the southern boundary. It is also recognized in a deed executed by Louis Baudin and others, and attested by Joshua Kennedy, in 1814; and again in 1820, by a deed attested by the same witness, and executed by Wm. E. Kennedy, as well as by the map prepared by Matthews, in 1817 or 1818, to say nothing of the testimony of witnesses in respect to its use by the public.

The evidence is quite sufficient to warrant the inference of a dedication, not only in 1803, but if necessary, for an indefinite period previous to that time. In respect to the admissibility of the evidence to this point, it may be remarked, that it was not questioned in the court below, and if it had been objected to, we think its competency entirely defensible. [1 Greenl. Ev. 166; Antones, et al. v. Heirs of Eslava, 9 Porter's Rep. 527; 6 Pet. Rep. 328; 7 Id. 554.] But if it were not permissible to intend a dedication previous to 1803, when Orsono gave to Collins a permission to occupy land bordering on " St. Louis street," we have seen that this act of the commandant, followed by a continuous use for such a number of years, would itself indicate a dedication, not inhibited by the concession of the Governor of Louisiana to Price, in 1798, and not annulled by the confirmation of the commandant at Mobile, in 1806.

In respect to the accretions at the eastern end of St. Louis street, or the reclamations by human effort, we think that they become a part of the street, as the city extended its limits eastward, across the marsh, towards the river ; quite as much as much as if the extension had been embraced by the original dedication. The location of Mobile, the extensive flat between the channel and the bank of the river, over which the tide flowed, the deleterious effect upon health, and the hindrance to trade; doubtless suggested the idea at a very early day, of making reclamations from the shore, as the commerce of the city furnished inducements to such improve-

Doe ex dem. Kennedy's Ex'rs v. Jones.

ments. This is but a reasonable and natural assumption, and authorizes the conclusion, that by dedicating the streets running east to the use of the town, and the public, to the margin of the shore, the marsh between the shore and the river was in like manner yielded up, as the wants of the community required its use. The cases cited from 6th and 10th Peters, are in harmony with this view, and we think is a necessary sequence from them.

The transfer of the possession of Mobile and the adjacent country from Spain to the United States in 1813 did not interfere with the rights of property, the plan of the town, or the right of its inhabitants to use the public streets as they previously had done. The right of use continued in the public and individuals in the same manner as it was enjoyed prior to the change of national flags—and we have seen that to perpetuate the dedication, it was not necessary that there should have been a continuous corporate existence of the town. If, however, the law were otherwise, it would be worthy of inquiry whether the dedication is not inferrible from the use of the street with the assent of the parties interested since 1814, when the town of Mobile was incorporated by the Mississippi Territory? We say with the assent of the parties, because their dissent is not shown or pretended.

But conceding that the fee of the soil appropriated to the street, is vested in the plaintiffs, and it may be asked if it was not competent for the corporate authorities of Mobile to have erected a wharf or other convenience for the mooring or anchorage of vessels at the eastern *terminus* of the street? If the corporation could have done this, and demanded wharfage or other kindred charges, what inhibition is there either in law or reason to prevent it from leasing to an individual the privilege of erecting a wharf with a license to receive these charges upon the payment of a yearly rent to the corporation? The view we have taken of the evidence of dedication relieves us from the necessity of answering these questions.

*Again:* If the ground has been used for a purpose not contemplated by the dedication, will such an abuse of the right invest the plaintiff with the right to the possession of the part thus diverted from the purpose to which it was des-

tined; or must not a court of equity be resorted to, "to compel a specific execution of the trust by restraining the corporation, or by causing the removal of obstructions?" In the City of Cincinnati v. White's lessees *supra* it was said that the mere naked fee will not entitle the plaintiff in ejectment to recover the possession of land. This is a possessory action, and to authorize the plaintiff to recover, he must have *the right of possession.* Whatever takes away this right of possession, will deprive him of the remedy by ejectment. It is abundantly shown by what has been said, that there is no error in the first charge given—certainly none that could have prejudiced the plaintiff.

The second and third charges we think are alike unexceptionable. If it could have availed any thing in the defence, it was permissible for the defendant to have shown that the grant to Price was made by Joshua Kennedy or some one else not authorized to grant the land embraced by it. [Polk's Lessee v. Wendal, et al. 9 Cranch's Rep. 87; Patterson's Lessees v. Winn, 11 Wheat. R. 380 ; United States v. King, et al. 3 How. Rep. 773.] If the grant was made without the authority of Spain acting through its officers, it was certainly void, and the plaintiff could only claim under the act of Congress and the consequent proceedings. The act merely confirms the special report in respect to the *Price claim ;* but neither the act nor the report designate its limits or boundaries. In this posture of the case, reference must be had to the survey made under the authority of the fifth section, or to the patent in which it is recited. If the survey ascertains limits which do not embrace St. Louis street, or the shore east of it, we cannot see how the plaintiff can claim the property in question as a riparian proprietor. But if the court had misapprehended the law in the second and third charges, it may be asked if the plaintiff could have been prejudiced, as he failed to make out a title on which he could recover.

The view taken is decisive of the cause—and we have only to add, that the judgment of the circuit court is affirmed.