# Webb *v*. City of Demopolis.

*Bill in Equity by Municipal Corporation, for Injunction against Obstruction of Street and River Landing.*

1. *Dedication of street in prospective city or town* —*Held*, as matter of fact, on consideration of the evidence in this case, that the original proprietors, under grant from the United States, of the land on which the town of Demopolis was laid off in 1819, dedicated to the public use as a highway the strip of land lying on the margin of the river, marked on the first map or plat of the town as Arch street, intending to afford to the purchasers of lots and citizens of the embryo town the advantages of free and uninterrupted access to the river, a highway of commerce. *Held*, also, as matter of law, that lots having been sold abutting on the street, and the map having been adopted as showing the limits of the town by the legislative act incorporating it, this dedication became accepted and perfect; and the validity of the dedication was not affected by the fact that said street, in its condition at that time, following the bends of the river, was in several places not susceptible of use as a highway, but required the expenditure of labor and money to make it passable.

2. *Title to land on margin of navigable river, between high-water and low-water mark.*—How far the title of a proprietor of land on the margin of a navigable river extends—whether to high-water mark, low-water mark, or the middle of the stream—is not a Federal question, though he may claim under a grant from the United States, but is to be determined by the laws of the State in which the land is situated, as declared by its statutes and judicial decisions; and the established law in Alabama is, that it extends to low-water mark, ending only where the right to the use of the water as a navigable stream begins.

3. *Right of city to erect wharves at river landing* —A city, or incorporated town, situated on a navigable river, can not, *it seems*, engage in the business of wharfing, erecting wharves, providing keepers thereof, and charging the public for their use in going or carrying property to and from the river, unless that power is conferred by special legislative act; but, when one of its streets, as laid off and dedicated to the public by the original proprietors of the land, extends along the margin of the river through its limits, the city necessarily has the implied right to construct suitable and convenient approaches to the water-line, and to make structures or excavations even beyond the water-line, such as are reasonably necessary and proper to enable the public to avail themselves of the rights of commerce and transportation afforded by the river, but having regard to the superior rights of navigation.

4. *Private use of public street, as affected by statute of limitations, lapse of time, equitable estoppel, or prescription.*—A city or town has no alienable interest in the public streets thereof, but holds them in trust for its citizens and the public generally; and neither its acquiescence in an obstruction or private use of a street by a citizen, or *laches* in resorting to legal remedies to remove it, nor the statute

of limitations, nor the doctrine of equitable estoppel, nor prescription, can defeat the right of the city to maintain a suit in equity to remove the obstruction.

APPEAL from the Chancery Court of Marengo.

Heard before the Hon. S. K. McSPADDEN.

The bill in this case was filed on the 11th June, 1888, by the "City of Demopolis," against John C. Webb and wife, and W. H. Creagh; and sought (1) an injunction against the continuance of a fence, which said Webb had erected across a part of Arch street, near the river; and (2) to prevent the collection of wharfage by the defendants, at their landing on the river at or near the foot of said street. At the first hearing, on demurrer, Hon. THOS. W. COLEMAN presiding as chancellor, it was held, (1) that the bill contained equity so far, and only so far, as it sought relief against the obstruction of the street; and (2) that John C. Webb was the only proper defendant, as he alone was charged with the erection and continuance of the fence. On appeal to this court, each party assigning errors, the decree of the chancellor was in all things affirmed.—87 Ala. 659.

Afterwards, in the court below, the bill was amended to meet the objections pointed out in the opinion of this court. The amendments were these: (1) by striking out the name W. H. Creagh as defendant; (2) by adding an averment that the landing, with the right to collect wharfage, was dedicated to the public with the street; (3) that the original proprietors of the land, in dedicating Arch street to the public, did not reserve any right to construct a wharf and charge wharfage, nor have the defendants acquired any such right by privity of contract with them; (4) that the river landing, and the right to collect wharfage as incident to it, were dedicated to the public with the street.

As shown by the former report of the case, the complainant claimed the right to the uninterrupted use of the street under dedication by the proprietors of the land in 1819, and further claimed, that the street extended in width beyond high-water mark, and embraced the "Lower Warehouse property." The defendants denied the alleged dedication as a matter of fact, and claimed that the street, if dedicated at all, did not extend beyond high-water mark on the bank; and they further claimed, by way of plea and answer, that the city had relinquished and forfeited her rights by non-user for more than forty years; and pleaded *laches*, lapse of time, the statute of limitations, prescription, and equitable estoppel. Other questions were raised by demurrer to the bill as amended, but they are not decided by this court.

On final hearing, on pleadings and proof, the court below rendered a decree as follows : "On due consideration of the pleadings and proof, as well as the arguments of counsel on each side, the court is of the opinion that the complainant is entitled to the relief prayed for in the bill as amended; and it is therefore ordered, adjudged and decreed, (1) that defendant's demurrers to the bill be, and they are hereby overruled; (2) that the street in the city of Demopolis, commonly called Arch street, as described in the bill and laid off in the original plan of the said town of Demopolis, along the bank of the river, extending from the river at low-water mark to the nearest lots surveyed and numbered in the plan of said town as shown by the maps thereof, was dedicated in the year 1819, by the then owners of the soil, to the free use of the public as a street, and as a landing, and the same should forever remain open to the free use of the public as a street and as a landing; (3) that the fence or fences erected and maintained by the defendants, or either of them, across said street, above and below the said lower landing, are public nuisances, and should be abated; (4) that the said defendants, by demanding and collecting wharfage from the people for the use of the said lower landing, or otherwise, and by obstructing the free use of said lower landing in Arch street, as averred in the bill and sustained by the evidence, have created and maintained a public nuisance, which should be abated, it being the usurpation of a franchise contrary to law.    (5) It is further ordered and decreed that the defendants shall, within thirty days after notice of this decree, which notice the register is hereby ordered to have given, remove the said fences erected and maintained by them, or by their consent, both above and below said landing and near thereto, from and out of said street, and failing to do so, and notice thereof and complaint to the register, he will report such failure to the next term of the court.    (6) It is further ordered and decreed, that the said defendants are hereby enjoined and restrained from obstructing the free use of said lower landing by the public in any manner, and from demanding or receiving wharfage or other pay for the mere use of said lower landing; and they are also enjoined and restrained from obstructing in any way the free use of said street by the public as a street or landing, they having no other or greater rights therein than other citizens.    (7) It is further ordered and decreed that the defendants pay the costs of this suit."

[Webb v. Demopolis.]

The defendants appeal from this decree, and assign each part of it as error.

GEO. W. TAYLOR, and JAMES T. JONES, for appellant.—(1.) The former appeal in this case was taken from a decree on demurrer, which admitted the material averments of the bill and the correctness of its exhibits. On that appeal, the facts being thus presented, it was decided (1) that there was a complete dedication of Arch street to the public, and (2) that the defendants were estopped to deny such dedication. On this appeal, from a decree on pleadings and proof, it is submitted that the evidence shows the incorrectness of the map or plat, called "Exhibit A" to the bill, establishes the fact that Arch street was not marked on the original map or plat of the town, and explains the additions made to the original map. It follows, then, that the defendants are not estopped to deny the dedication of Arch street as claimed, and that the legislative act adopting the plan of the town as a part of its charter does not affect the question of its dedication. (2.) It is shown that Arch street was not designated by name on any map prior to 1850, several years after the rights of defendants' grantors to the lower landing accrued, and while they were in possession of the property under claim of right; that when it was marked and designated, its width was stated to be 66 feet, leaving an open space between it and the river from 50 to 100 feet wide; and that this open space was marked "*Common, 150 feet.*" It is shown, also, that the lower landing, where the defendants' wharf is situated, is below high-water mark—in fact, is in the bank of the river; that it is separated from Arch street, so called, by a ravine which was impassable until the defendants cut a road and built a bridge; and that the public, since using the landing, have paid wharfage. As to the bearing of these facts on the question of dedication, see *Oswald v. Genet,* 15 Texas, 118; *Mayor v. Stuyvesant,* 17 N. Y. 34; 95 Amer. Dec. 729; *Municipality v. Cotton Press,* 36 Amer. Dec. 624; *O'Neill v. Annette,* 72 Amer. Dec. 367; *Shreveport v. Dronin,* 6 So. Rep. 656, La. (3.) If there was any dedication of Arch street to the public, it did not extend beyond high-water mark on the river bank, because the dedicators did not have any title beyond that.—Gould on Waters, §§ 24, 27, 29; Houck on Rivers, §§ 6, 8, 9, 10; *Pollard v. Hagan,* 3 U. S. Rep. 212, 229-30; *Mayor of Mobile v. Eslava,* 9 Porter, 577; *Mobile v. Eslava,* 16 Peters, 234; *Duval's Heirs v. McLoskey,* 1 Ala. 708; *Pollard v. Greit,* 8 Ala. 930-42; *Barney v. Keokuk,* 94 U. S. 324. (4.) The dedication of Arch

street to the public did not take away or in any way affect the riparian rights of the owners of lots abutting on it. Gould on Waters § 72; *McManus v. Carmichael*, 3 Iowa, 1; *Leonard's Heirs v. Baton Rouge*, 4 So. Rep. 243; 2 Amer. St. Rep. 233. (5.) If there ever was any dedication of the street, or the part of the land here in controversy, it was lost by abandonment and non-user for nearly forty years.—*Gardner v. Tisdale*, 60 Amer. Dec. 407, 418; *Peoria v. Johnston*, 56 Ill. 45; *Sletson v. Faxon*, 31 Amer. Dec. 123; 5 Lawyer's Rep. Ann. 652, notes. (6.) If Arch street was dedicated to the public by the proprietors of the land, the dedication only conferred the right to make it a highway by improving it, making it passable, using and repairing it; and until this was done, a fence, or other obstruction erected on or across it, was not a public nuisance.—*Kennedy v. Williams*, 87 N. C. 6; 40 Iowa, 131; 1 Amer. Dec. 647. On the facts shown by the record in this case, the street without the fence would be impassable, and a public nuisance. (7.) The city of Demopolis has no power to erect wharves and charge wharfage, that power not having been granted by its charter. This right is a franchise belonging to the State, or pertaining to riparian owners by grant or prescription.—*Demopolis v. Webb*, 87 Ala. 659; Houck on Rivers, § 283; Gould on Waters, §§ 22, 23, 37, 120, 141, 167; *Milton v. Haden*, 32 Ala. 30; 55 Ala. 480, 490–93. If the State has not parted with this franchise by grant or prescription, it may complain of the usurpation thereof, but no one else can; and if the State has parted with it, as presumed from user and the lapse of time, the city can not maintain its suit.—Houck on Rivers, §§ 292, 299; Gould on Waters, 329, §§ 21, 92, 93; *Dutton v. Strong*, 1 Black, 1. (8.) The facts in evidence present a strong case of equitable estoppel, arising from the assertion and growth of private rights of more persuasive force than the original rights of the public long since abandoned; an estoppel which, as Mr. Dillon says, may not be matter of strict law, but is to be determined by the court according to the particular circumstances of each case "as justice and right may require."—2 Dill. Munic. Corp. § 675. The landing was not originally practicable nor accessible, except when (at a very high stage of the water) boats could discharge freights and passengers on the edge of the bluff. By artificial means, at a great expenditure of labor and money, the owners of the warehouse properly made the landing practicable at all stages, cut a road in the limestone bluff, and constructed a railroad track so laid as to make an accessible landing at every stage of the river: they created the

landing and the approaches to it, which were necessary at that time to the development and prosperity of the prospective town, for forty years or more, before the introduction of railroads. The State did not give the town power to do this, nor to authorize others to do it, and must be held to have purposely left the matter to private enterprise, energy and capital. The public generally has reaped the benefit of the improvements thus made, for more than forty years, and the effort now is made to confiscate these property rights under a claim of antecedent public rights, which, if they ever existed, were never asserted, and were forfeited by non-user.

PETTUS & PETTUS, and GEO. G. LYON, *contra.*—(1.) The decision of this court on the former appeal settles most of the legal questions presented in this case.—*Demopolis v. Webb*, 87 Ala. 659. The evidence clearly establishes the dedication of Arch street to the public in 1819, extending to the river, and carrying with it by necessary implication, as matter of fact and of law, the right to use the banks of the river as a free public landing.—*Haight v. Keokuk*, 4 Iowa, 199; *Barney v. Keokuk*, 94 U. S. 340; *New Orleans v. United States*, 10 Peters, 717; *Godfrey v. City of Alton*, 12 Ill. 36, or 52 Amer. Dec. 478; *Lamar v. Clements*, 49 Texas, 347. (2.) The Tombigbee river being a navigable river, by constitutional guaranty, State and Federal, it is, and shall always remain, a public highway, free from any tax, duty, impost, wharfage, or other charge.—Const. Ala. 1875, Art. I, § 25; Const. Ala. 1868, Art. I, § 26; Const. Ala. 1819, Ordinance accepting terms imposed by act of Congress for admission of Alabama into the Union; U. S. Land Laws, Ed. 1838, 98, 588, 596, 310, discussed in *Mayor v. Eslava*, 9 Porter, 596. (3.) The city of Demopolis had no alienable interest in the street or landing, and could not forfeit any right therein by *laches*, acquiescence, the statute of limitations, or prescription.—Dill. Munic. Corp., § 533; *Wright & Rice v. Moore*, 38 Ala. 598; *Reed v. Birmingham*, 92 Ala. 339; *Jersey City v. Canal Co.*, 1 Beasley, N. J. 547; *Cross v. Mayor*, 18 N. J. Eq. 312; *Com. v. Upton*, 6 Gray, 476; *People v. Cunningham*, 1 Denio, 536; *Mills v. Hall*, 9 Wend. 315; *Com. v. McDonald*, 16 Serg. & R. 390; 4 Mart. La. 2; 4 La. Ann. 73; 13 Ill. 60. (4.) The evidence does not make out the defense of the statute of limitations, nor of prescription, since it does not show continuous adverse possession for the prescribed period of time.—*Riggs v. Fuller*, 54 Ala. 146; *Brandt v. Ogden*, 1 Johns. 156; Washb. Easement, 4th., 86, m. p., § 26.

[Webb v. Demopolis.]

McCLELLAN, J.—Other questions will be discussed and decided in the progress of this opinion, but in the view we take of the case the inquiries of paramount and determining importance are three only: *First:* Did the original proprietors of the land on which the city of Demopolis was subsequently built dedicate to the uses of the public as a street that part of said land which lies between certain numbered lots in the plat or plan of said city and the Tombigbee river, now known as Arch street? *Second:* Did such dedication, assuming it to have been efficaciously made, extend to the water-line at all stages of the river in such sort as to invest the inhabitants of Demopolis, and the public generally, with the right to pass, in their persons and property, from said street on to the river, and from the river on to the street, without toll, charge or hindrance? *Third:* Has this public right, assuming its original existence, been lost, so far as it pertained to that part of said street which has been appropriated by the respondents, by reason of the character, extent and duration of their possession, occupancy, and use thereof?

The land in question, and which now constitutes the city of Demopolis, was purchased by George S. Gaines, acting for himself and certain associates, in the year 1819, from the United States; and he received patents therefor, which were "intended by him, and recognized by him, as being issued to him" for a company consisting of himself, William A. Cobb and others. This company had been formed for the purpose of purchasing said land at the Government sales, soon thereafter to be made, with a view to, and for the purpose of, laying off and establishing a town thereon, and selling lots therein. The land was exceptionally well located for the establishment and upbuilding of a town under then existing conditions of commerce and transportation, being at a high point on the Tombigbee river, a navigable stream, emptying into the Bay of Mobile, just below its confluence with the Black Warrior river, another navigable stream. And it was doubtless these considerations which not only led to the selection of this site, but which also gave birth to the great expectations, indicated by the handsome prices at which lots in the embryo city were sold, which were indulged as to its future—expectations which probably only failed of full realization in consequence of the application of steam as a motive power to inland transportation, whereby the importance of water-ways was greatly lessened. Be that as it may, it is certain the chief inducement to the location of Demopolis at this point lay

in the facilities for commerce and transportation which the river afforded, and doubtless this consideration was put prominently forward in the efforts made by the company to sell its lots in the town. The river thus being a leading inducement to the location of the town and to the purchase of lots therein, it would have been singular indeed if the proprietors of the site had not made provision looking to the utilization of this water-way by those who had been induced in great part to settle there, because of the facilities for transportation offered by it, and the public at large, by so laying out the town as to afford easy access to the river from the town, and *vice versa*. They did not fail to make such provision, but left the whole river front of the city open, unobstructed, and free of access. It is not controverted at all that on every plan, plat or map of the town, from the first one made by Stone soon after the purchase of the land, and by reference to which the original sales of lots were made, down to the last one made only a few years ago—all later maps being more or less accurate copies of the one made by Stone—on every map now extant, or that has ever existed, there appears an open space along the river front entirely through the town, varying in width from, perhaps, one hundred to two hundred feet, with the irregular course of the stream, and extending, throughout its course, to the water's edge. The physical characteristics of this space, so far as they appear from the maps, are the same, except as to the irregularity in width, just referred to, and as to variance of direction incident to the tortuous course of the river, as are incident to the many other vacant spaces shown by the maps; and these other spaces are admitted to be streets of the town. In other words, one looking at any map of the town which has been brought to light on this trial, with a view to ascertaining the location of the streets, would inevitably conclude that this unplatted margin along the river was one of those streets. And such, we have no doubt, it was intended to be by the Demopolis Town Company, when the site was laid off into public squares, streets and lots, for the purposes of sales then contemplated and afterwards made by the company. This, we think, the evidence demonstrates; and not only this—not only that this margin was laid off as, and intended to be a street—but also that this street was in the outset named and called "Arch Street." Mr. Geo. G. Lyon testified, that he had seen the original plan or map made by C. C. Stone and adopted by the Commissioners of the Demopolis Town Company in 1819, by reference to which the first sales were

[Webb v. Demopolis.]

made, and from which all other maps of the town were taken, more or less directly; and that on this original map the margin or unplatted space along the river front was designated as "Arch street;" and that he lived on this street for ten years, from 1841 to 1851, and always heard it called "Arch street." Mr. A. M. McDowell appends to his deposition a map made by C. C. Stone, and which the witness believes to be the original map above referred to—as to which, however, there is at least grave doubt—and this old map shows, as do all other maps, an open margin along the entire river front, which presents the appearance of a street; and this margin at one place is marked "Water street," and at another place, in a hand-writing differing from that elsewhere shown on the map, and from the inscription "Water street," it is marked "Demo street." This inscription appears to have been made at a later date than any other on the map. This witness testifies, also, that the initial point of the survey of the town of Demopolis was originally marked by an oak tree which stood in this *street;* that this tree had been removed, and he himself had placed an iron shaft where it stood, for the purpose of preserving a memorial of the starting point of the survey. And the location of this tree is marked and identified on the map which he exhibits, by a star placed near the intersection of Fulton street with this street on the bank of the river, and referred to in the notes written on the margin of the map thus: "*Post Oak, bears S. 12 E., 8 links (†)"

But the most satisfactory evidence that the proprietors of the town site laid this margin off as a street, intended if to be a street, and named it "Arch street," is found in the record of the proceedings, of the commissioners who constituted the managing and governing board of the Demopolis Town Company. It appears from these records that said commissioners, at a meeting held on Tuesday, June 18, 1819, "*Resolved,* That the plan of the town of Demopolis be as follows : The streets to run due north and south on a true meridian variation, seven degrees and forty-five minutes east, and to be crossed by streets running due east and west at right angles. The squares to contain two acres of land, exclusive of an alley of twelve feet wide running from north to south. The streets of the town to be sixty feet, excepting Fulton street running from east to west, one hundred feet; Capital street, from east to west, likewise one hundred feet; Market street, running from north to south, one hundred feet. *Resolved,* that one square or block of lots containing eight

in number, bounded north by Capital street and west by Market street, be reserved for the erection of such buildings as the commissioners may hereafter determine on. The plan of said town is herewith filed, which is made a part of this record, *signed by the commissioners* as the true plan of the town of Demopolis; by which plan the town commences at that point *where Fulton street intersects* ARCH STREET, which said point is designated *by a post-oak tree*, in or about twenty inches in diameter, which said tree stands south of said point of intersection or corner twelve degrees east, and distant eight links from said corner, marked with the following letters and characters: * *lettered S. 12 E. 8 Lk.*, which said point is on the original survey of the United States Government of fractional section No. twenty-four, and is opposite the crevice in the bank of the Tombigbee River." The italicization in the foregoing excerpt is ours. It has been employed for the purposes of giving emphasis to the facts, that the plan or map adopted by the commissioners *was signed* by them, while the map exhibited by McDowell is not so signed; that the margin of the river was laid off on the original plan as a street, and called and named thereon "Arch street," and not "Water street," or "Demo street," as appears from McDowell's map; and that the tree which marked the initial point of the survey was located on "Arch street," and opposite "the crevice in the bank of the river," which latter fact is shown also by McDowell's map; all of which leads to the conclusion, that the map exhibited by McDowell is not the original plan or map adopted by the commissioners, but a copy thereof, and accurate in so far as it shows that the land between the numbered lots and the river was intend to be, and in fact was, laid off as a street, but inaccurate in so far as it gives the name "Water" or "Demo" to this street. We attach no importance to the fact that the commissioners, in the resolutions quoted, did not state either the direction or width of Arch street. It ran neither north and south, nor east and west, but *arched* with the bend of the river, and hence doubtless its name. Its width likewise varied with the meanderings of the stream, and hence it could not be said to be any particular number of feet wide. But, however irregular its course, and however variant its width, this record demonstrates beyond all doubt to our minds that it was laid off as a street in the original plan of the town; that as such it extended along the entire river front of the town, and that throughout its length it was named,

known and called "Arch street." So far then as that could be accomplished by laying off an area in the plan or map of a town having the appearance of a street on such map, intended by the proprietors of the town-site to be a street, and marked on said plan as a street with a name appropriate thereto, this "Arch street" in the town of Dempolis was dedicated to the public as a street, by that name, on June 18, 1819, when said plan was adopted and promulgated "as the true plan of the town of Demopolis."

One thing more, and only one thing, was necessary to complete the dedication so as to make it forever irrevocable. That one thing was the sale and conveyance of lots, or even the sale and conveyance of a single lot, in the town of Demopolis, by reference to and according to the survey lines of the plan or map which had this street marked upon it. By such sales, or one such sale, every line of the survey which served to mark those parts of the site which were intended to be reserved from sale for the use of the public became unalterably fixed—dedicated to the public for all time.— *Webb v. Demopolis*, 87 Ala. 569 ; *Evans v. C. & W. Railway Co.*, 90 Ala. 54 ; *Reed v. Mayor & Aldermen of Birmingham*, 92 Ala. 339 ; Elliott on Roads and Streets, p. 89. It is uncontroverted that lots were sold and conveyed according and by reference to this plan, soon after its adoption, and from time to time since then. Not only so, but the dedication of the streets of Demopolis, and among the rest Arch street, was accepted in the most formal manner by an act of the legislature of Alabama, incorporating the town of Demopolis, approved December 15, 1821, in which it is provided : "That all the tract of land included in the plan of said town [the plan adopted by the commissioners in 1819] be, and the same is declared to be, the limits of said town in conformity to said plan."—Elliott on Roads and Streets, 85. So that there can be no doubt that there was both a common-law and a statutory acceptance of the dedication of the street.

As to the extent of this dedication, or rather as to the limits of the street as dedicated, with reference to the river, there can not, we think, be two opinions so far as the question depends upon the intention of the proprietors of the soil. In view of the considerations which led to the establishment of a town at that point, the advantages expected to accrue to the inhabitants thereof from the facilities for transportation and commerce, which the juxtaposition of this water-way offered, and the necessity to utilize and conserve these advantages by affording the public ready and

unobstructed access to the river,—considerations to which we have before adverted,—and in view of the fact that, as appears from all the maps, no disposition of any part of the river front to private uses was contemplated by the founders of Demopolis and the dedicators of this street, the conclusion can not be resisted, that they intended that this street should embrace all that part of the site of the town which lay between the numbered lots and the water's edge at all stages of the river. In no other way could their manifest purpose of providing a common highway, not only along, but to and on the river, be effectuated. And this purpose must be held to have been effectuated, if they, the proprietors of the soil, had the right to dedicate the land to low-water mark, or, in other words, if their proprietorship extended to the low-water line.

We can not concur in the argument of counsel, to the effect that whether a grant of the United States to land lying on a navigable stream within the limits of a State extends to high or to low-water mark, or to the middle thread of the stream, is a Federal question, upon which the Supreme Court of the United States is the final arbiter. This is not the law. On the contrary, no proposition of law is more firmly settled, than that this is a matter purely within the control of the several States, and determinable in all instances according to the rule in respect thereto which has been established by statute, or by adjudications of courts of last resort or otherwise, by the States themselves. And whatever rule has been so established is said to be the common law of the State where the land is situated, and as such will be enforced in all jurisdictions. This doctrine proceeds on the theory, that inasmuch as the State owns in its sovereign capacity the soil under the waters of navigable streams, it is within the State's competency to determine to what extent its prerogatives to lands so submerged shall be exercised, and to what extent such prerogative shall be abated, or not asserted and exercised, in the sense of admitting individual proprietorship in such lands, subject only to those rights of eminent domain over the waters and the lands covered thereby which are inseparable from sovereignty. And upon this theory it is universally held, that a grant by the United States of land lying in a State, and abutting on a navigable stream, will extend to high-water mark, or low-water mark, or to the middle of the stream, according to the rule which the particular State has adopted as to the construction and extent of such grade. The late Justice Bradley in a recent case, after stating the doctrine

of the State's proprietorship in the banks and shores of navigable streams and waters, proceeds : "This right of the States to regulate and control the shores of tide-waters, and the land under them, is the same as that which is exercised by the Crown in England. In this country the same rule has been extended to our great navigable lakes, which are treated as inland seas ; and also, in some of the States, to navigable rivers, as the Mississippi, the Missouri, the Ohio; and, in Pennslvania, to all the permanent rivers of the State; but it depends on the law of each State to what waters and to what extent this prerogative of the State over the lands under water shall be exercised. In the case of *Barney v. Keokuk*, 94 U. S. 324, we held that it is for the several States themselves to determine this question, and that if they chose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections. That was a case which arose in the State of Iowa, in regard to land on the banks of the Mississippi, in the city of Keokuk; and it appearing to be the settled law of that State, that the title of riparian proprietors on the banks of the Mississippi extends only to ordinary high-water mark, and that the shore between high and low-water mark, as well as the bed of the river, belongs to the State, this court accepted the local law as that which was to govern the case. The same view was taken in quite a recent case with regard to titles on the Sacramento River, under the law of California.—*Packer v. Bird*, 137 U. S. 661. On the east side of the Mississippi, in the States of Illinois and Mississippi, a different doctrine prevails, and in those States it is held that the title of the riparian proprietor extends to the middle of the current in conformity to the rule of the common law, that the beds of all streams above the flow of the tide, whether actually navigable or not, belongs to the proprietor of the adjoining lands.—*Middleton v. Pritchard*, 3 Scammon, 510 ; *Morgan v. Reading*, 3 Sm. & Mar. 366 ; *St. Louis v. Rutz*, 138 U. S. 226. In the one case, that of Iowa, the Government grant was held to extend only to high-water mark ; and in the other cases, of Illinois and Mississippi, it was held to extend to the centre of the stream; being governed in both cases by the respective laws of the States affecting the grants of lands bordering on the river. In the one case, the State, by its general law, does not allow the grant to enure to the individual further than to the water's edge, reserving to itself the ownership and control of the river bed ; in the other cases, the States allow

the full common-law effect of the grant to enure to the grantee."—*Hardin v. Jordan*, 140 U. S. 371, 382–3.

There was in this case a dissenting opinion by Brewer, J. concurred in by Gray and Brown, JJ. The dissent, however, was not on the point we have been considering, but from the conclusion of the majority of the court as to what was the rule of law in this connection in Illinois, respecting lands under the waters of *lakes and ponds;* a different rule, these judges conceived, being established in that State as to such lands, from that which obtained there as to lands under running water. And on the point we have here, Mr. Justice Brewer said: "Beyond all dispute, the settled law of this court, established by repeated decisions, is, that the question of how far the title of a riparian owner extends is one of local law. For a determination of that question the statutes of the State, and the decisions of its highest court, furnish the best and the final authority."—*Hardin v. Jordan, supra,* p. 402. And the same doctrine is clearly announced in the still later case of *Kankanna Water Power Co. v. Green Bay & Mississippi Canal Co.,* 142 U. S. 255; and there can be no question of its soundness in principle, and thorough establishment by the authorities.

Whether the grant made by the United States to George S. Gaines for the Demopolis Town Company, and which enured to its benefit, of the land upon which the city of Demopolis now stands, extended to ordinary high-water mark, or to the line of the low water, or to the middle thread of the Tombigbee river, depends, therefore, upon the rule of property in this respect, which Alabama has adopted. The rule which this State has adopted and declared through this court is, that a grant by the United States to land bordering on a navigable river includes the shore or bank of such river, and extends to the water line thereof at low water.—*Williams v. Glover,* 66 Ala. 189; *City of Demopolis v. Webb,* 87 Ala. 670. And this doctrine was long ago applied in a case like the one at bar, this court holding that the dedication of a street bordering on navigable water extends to low-water mark.—*Doe, ex dem. v. Jones,* 11 Ala. 63.

Applying this rule of property to the grant of the United States to George S. Gaines and associates, constituting the Demopolis Town Company, of the land upon which the town was subsequently built, the result is to invest said purchasers with title to said land down to the low-water line of the river; and they, having, as we have seen, the *animus dedicandi* coextensive with their proprietorship of

the land between the line of the adjacent numbered lots and the river, must be held to have efficiently, and, when taken in connection with the acceptance by the public, which the record shows, irrevocably dedicated the whole space from said lots to low-water mark to the public as a street under the name of "Arch street."

Our conviction that this result is enforced by the evidence is in no degree weakened by the testimony of some of the witnesses, to the effect that they never knew there was a street in Demopolis along the margin of the river; or of yet some others, who say they never heard of "Arch street" prior to the inception of this litigation. It is not unusual, we feel safe in saying, for the names of streets in towns of the size of Demopolis to fall into disuse and oblivion,. or for streets laid off in town maps and dedicated to remain unopened, or, being once opened, to be closed to the public and occupied for private purposes. And that this is true of Demopolis abundantly appears from the evidence here, going, as it does, to show that not a few of the other streets, as to the dedication of which there is no controversy, had remained or become closed in whole or in part, and that many of the citizens of the town, long resident there, were ignorant of the names of various streets which had been all along open, used and recognized as streets.

Nor is it a matter of any moment that the ground constituting Arch street could not, in its natural state, be used throughout its length as a street. It would not, we apprehend, be controverted, it is not in fact controverted, that it was feasible to overcome all obstructions to the use of this street which the character of the surface over which it was laid out presented. Nor can it be controverted that it *had* to be, and has all the time been, used at one point or others for the purposes of access to and regress from the river. It is to be doubted whether a single street in the town of Demopolis, as laid down on the virgin soil in the year 1819, could, in its then natural state, have been used for the purposes of its dedication; possibly others of them than Arch street required great labor and expense to adapt them to the uses of highways; and if Arch street was more rugged and required greater exertion to make it practicable for the passage of persons and the transportation of property along its course, or across it to the river, the necessity for such exertion was the more imperative, in that it alone of all the streets of the town afforded an outlet to the river, commerce on which constituted so important a factor in the life and prosperity of the

town. But aside from all this, a dedication of land as a street can in no case, in our opinion, be defeated by considerations going to the relative adaptability of the land to that end, or to difficulties of subjecting it to such uses in point of fact, or to the extent of the use to which it will be subjected when its natural obstructions have been removed, or even to the necessity to so use it all.—*City of Dubuque v. Malonly*, 74 Amer. Dec. 358; *Hanson v. Eastman*, 21 Minn. 509; *Regina v. Spence*, 11 Upper Canada G. B. 31.

The Tombigbee river, opposite the city of Demopolis, is a vavigable stream, on which the public have the right of transportation of person and property, free of all charges or imposts whatever, subject to such regulations as Government may deem just and expedient in conservation of the public easement. In juxtaposition to this easement is that other which the public have in Arch street, and this latter extends to and ends only at the point where the former begins. There is, and in the nature of things can be, no particle or *scintilla* of space between that side of Arch street furthest from the river and the water-line of the river furthest from the town of Demopolis, which is not covered by one or the other of these easements, and over which the public would not have the same right to pass and transport property as they would have along the course of Arch street, or up and down the current of the stream; and it follows as a necessary consequence, that an obstruction to the use of this street for the purpose of going on to the river, would be as violative of public right, and as unlawful, as an obstruction to its use for the purpose of going along it from one part to another of the town. These propositions are, to our minds, self-establishing results from the existence, side by side, and extending to the touch with each other, of these two public easements, and they are abundantly supported by authority.—*Godfrey v. City of Alton*, 12 Ill. 36; s. c., 52 Amer. Dec. 478; *Haight v. City of Keokuk*, 4 Iowa, 199; *Barney v. Keokuk*, 94 U. S. 340; *New Orleans v. United States*, 10 Peters, 717.

Nor do we question the right and power of the city of Demopolis to provide facilities looking to the use of this street as a means for the passage of persons and property back and forth from the town to the river. The right to so use it free of charge being in the public, it may be, indeed we are inclined to that view, that the city could not, without special statutory authority, engage in the business of wharfing in the sense of erecting wharves, providing keepers thereof, and charging the public for the privilege of using

[Webb v. Demopolis.]

them in going to or from the river, or in lading or unlading property from or on them. But we do not doubt that the city, in the absence of legislative delegation of it, has the power and authority which is implied from the location of this street, and the manifest purposes of its dedication, not only to make suitable and convenient approaches from the town to the water-line, but also to make such structures or excavations, at and even beyond the water-line, having regard to the rights of navigation, as are reasonably necessary and proper to enable the public to conveniently avail themselves of the rights of commerce and transportation which the river offers. The existence and exercise of the right to do this is essential to the enjoyment of that other right, which the inhabitants of the town and the public incontrovertibly have, to pass in their persons and effects from the town to the river, and *vice versa;* and hence is a right implied from its necessary connection with a right which is expressly granted. It is based on the same principle of necessity as that under which a municipality would rest to adjust the grade of a street with the grade of a public road leading up to its corporate line, and which, we apprehend, might, when necessary, be done by depressing or elevating the latter ; though, dissociated from the street, the municipal authorities would have no power to build or change a highway beyond the lines of the town. So, too, we should say, that where the corporate line is on the near bank of a stream, ravine or ditch, which could only be passed by means of a bridge, the municipality, though without express power to build bridges beyond its own territory, would be authorized to gain access to the outside world by bridging such stream, ravine or ditch, wherever it should be intersected by streets. And *a fortiori* would this be true, where, as in this case, the chief, if not the only purpose of the particular dedication, was to afford egress beyond such barrier. It was upon considerations of this sort that it has been held in several well reasoned cases that a town has the implied power to erect wharves for the convenience of the public under circumstances such are found in the present case. *Rowan's Ex'rs v. Portland*, 8 B. Monroe, 232 ; *Newport v. Taylor's Ex'rs*, 16 B. Monroe, 699, and 804 ; *Potomac Steam Co. v. Upper Potomac Steamboat Co.*, 109 U. S. 672, 686-7.

This view disposes of the argument for appellants which proceeds on the supposed want of authority in the city of Demopolis to erect wharves and the like, and the consequent necessity for this to be done by a private enterprise, to the conclusion that appellants had the right they exer-

cised to erect wharves at the "Lower Landing," and charge the public for the use thereof.

Having thus reached the conclusion that the whole of Arch street, extending to lower-water mark, was dedicated to the public, it is next to be considered whether the easement vested in the public has been lost. It is strenuously insisted for appellants that it has been lost, so far as respects that part of the street now occupied by them, including what is known as the "Lower Landing" on the river front of Demopolis, through the possession of themselves and their predecessors in ownership of the lower warehouse property for a great period of time, under an exclusive claim of right, and the application to these facts of the doctrine of prescription. On this question of possession on the part of appellants, and those under whom they claim, of the street and landing in question, the character of that possession, its duration, &c., a great mass of testimony has been taken by each side. We have read it carefully, more for the pupose of finding evidence of relevant and material facts than with a view to determining whether a possession of the character set up in the pleadings had existed, and, if so, for what length of time. These inquiries we deem entirely immaterial to any issue in the cause. Without going at all into them, or intending by what we say to indicate what our conclusion in respect to them would have been had they been deemed relevant inquiries, we will concede, for the argument, that the appellants and their predecessors in ownership of the lower warehouse property had, without interruption, since 1844 had actual possession of said street, said lower landing, and the immediate approaches thereto; that this actual possession has all along been exclusive of the whole world; that continuously during all that time they have claimed title to said landing and the approaches, and so much of said street as has been occupied by them, and have claimed in all cases, and exercised at pleasure, the right to charge all persons for the privilege of using said landing as a wharf; and further, that they have greatly improved the landing and approaches thereto—have, if you please, *created* the landing, in the sense of building the approaches to it, and providing all the facilities which now exist, or have ever existed for reaching and going on the river at that point; or, in other words, we will concede every thing which appellants claim as to the *facts* of their relation to this landing.

But all this will not help them. The law applied to these facts does not enforce any result of benefit to them. No

[Webb v. Demopolis.]

statute of limitations, or principle of repose, obtains here. Neither the statute of limitations, nor the rule which carries title to adverse possession, nor the doctrines of staleness, equitable estoppel or prescription, can be invoked or applied against the right of the city of Demopolis, and of the public, to have this street opened from end to end, and from side to side, from the municipal line on the north to the municipal line on the south-east, and from the numbered lots of the town to lower-water mark of the stream, and devoted to the uses to which it was dedicated by the original proprietors in 1819. The city never had any alienable title to, or right in the street. It could never have granted it, or any part of it away, for any purpose whatever. Having no power of direct alienation, it could not pass title indirectly by submitting for the statutory period to private possession, claim and use. Having no power to grant it, no grant can be presumed from the lapse of time, however great, during which it has allowed respondents to deal with a part of it as belonging to them. Respondents being held to know—a rule, the propriety of which is emphasized here by the muniments of their title to the warehouse property, which show the fact—that all the space between their lots and the low-water line of the river was in and constituted Arch street, expended money and labor in putting improvements thereon at their own peril, and in recognition of the right of the city to deprive them of all private benefit therefrom by throwing the entire street open to the free use of the public, whenever the municipal authorities deemed it expedient so to do ; and hence no element of equitable estoppel against the public enters into their claim.

These positions are well grounded in text and adjudged cases, including recent adjudications of this court. Judge Dillon, after stating the views of several courts of last resort on this subject, sums up what he considers the true doctrine as follows : "Municipal corporations, as we have seen, have in some respects a double character—one public, the other (by way of distinction) private. As respects property not held for public use, or upon public trusts, and as respects contracts of a private nature, there is no reason why such corporations should not fall within limitation statutes, and be affected by them. . . . . But such corporation does not own, and can not alien, public streets or places, and no mere *laches* on its part, or that of its officers, can defeat the right of the public thereto."—2 Dillon Mun. Corp. § 675. And the author incorporates in the text the views of the Supreme Court of Pennsylvania, to this effect : "Streets and

public squares are dedicated or acquired for the *public* use, not alone for that of the people of the city, the corporation being the mere trustee for the public; that erections by private persons on property thus dedicated or acquired, can not be authorized by the original proprietor, or by the city corporation, and can be authorized only by the legislature; that unauthorized erections or obstructions thereon are public nuisances,  . . .  ; and that in the absence of a grant shown from a competent source, no presumption from mere lapse of time can be made to support a public nuisance which is an encroachment on a public right." And he quotes with approval from an opinion of Mr. Justice Sargeant the following language: "These principles of law, as well as our own Code, are essential to the protection of public rights, which would be gradually frittered away, if the want of complaint or prosecution gave the party a right. Individuals may reasonably be held to a limited period to enforce their rights against occupants, because they have an interest sufficient to make them vigilant. But in public rights of property each individual feels but a slight interest, and rather tolerates even a manifest encroachment than seeks a dispute to set it right."—2 Dillon Munic. Corp., § 669; *Com. v. Alburger*, 1 Whart. (Pa.) 469, 488; *Sims v. Chattanooga*, 1 Lea (Tenn.) 694; *Jersey City v. M. C. & B. Co.*. 12 N. J. Eq. 557, 561.

And this doctrine has been fully adopted by this court in more than one case, the last being that of *Reed v. Mayor & Ald. of Birmingham*, 92 Ala. 339, 348-9, citing *Olive v. State*, 86 Ala. 88, where the same principle is "broadly asserted;" and quoting as above from Dillon on Municipal Corporations, and as follows from Elliott on Roads & Streets, p. 490: "There can be no rightful permanent possession of a public highway for private purposes; and although a right to maintain a private nuisance may in some cases be acquired by prescription, no length of time will render a public nuisance, such as the obstruction of a highway, legal, or give the person guilty of maintaining it any right to continue it to the detriment of the public." See, also, Elliott on Roads & Streets, 667 *et seq.* This may now be said to be the established law of Alabama.

That the private use of a public highway of a character which is subversive of its use by the public as a thoroughfare may be perpetuated in any case by the invocation of the doctrine of estoppel *in pais* against the municipality in which the highway lies, we very much doubt. It would seem on principle that, inasmuch as the municipality has

no alienable right in such highway, none which could be lost through its *laches*, or through actual private possession under a claim of exclusive right, but holds the *locus in quo* not only for itself, and for its own citizens, but in trust for the public at large, whose rights therein are in no wise dependent upon anything the municipality may do or omit to do ; that nothing done or omitted by a city in the way of allowing, or even inducing persons to make erections on a street, which obstruct and interfere with its use, could or ought to estop the public to have such obstruction removed, or to have them removed at the suit of their trustee and agent, the municipal corporation. Yet Judge Dillon says, there may possibly be instances of such estoppel ; but he adds, that "such cases are exceptional in their character, and it would, perhaps, be going too far to say that the courts have distinctly established such a principle."—2 Dillon on Munic. Corp., § 667. And the Messrs. Elliott, in their valuable work on Roads & Streets, say, that while some courts, "influenced, perhaps, by the hardship that would result from a contrary holding in the particular cases under consideration, have applied the doctrine of equitable estoppel where the claimant had made expensive improvements," &c., yet, it is doubtful, they say, "if the doctrine of these cases can be sustained upon principle," except perhaps where the city has by affirmative action misled the claimant. And the text proceeds : "It is difficult to conceive upon what principle an equitable estoppel can be securely placed in such cases ; for the person who encroaches upon a public way must know, as a matter of law, that the way belongs to the public, that the local authorities can neither directly nor indirectly alien the way, and that they can not divert it to a private use. As the person who uses the highway must possess this knowledge, and in legal contemplation does possess it, one of the chief elements of an estoppel is absent. An estoppel can not exist where the knowledge of both parties is equal, and nothing is done by the one to mislead the other. In addition to this consideration may be noticed another influential one, already suggested in a different connection; and that is, the private use of the public way was wrong in the beginning, and wrong each day of its continuance ; and it is a strange perversion of principle to declare, that one who basis his claim on the original and continued wrong may successfully appeal to equity to sanction and establish such a claim. It is, at all events, a great stretch of the doctrine of estoppel, and a wide departure from the rules laid down by the earlier decisions, and confirmed by

[Savannah & Western Railroad Co. v. Meadors.]

the modern authorities."—Elliott on Roads & Streets, pp. 669 and 670.

We adopt the principle thus declared, and it leads inevitably to the conclusion that, on the facts of this case, there was no estoppel resting on the city of Demopolis to assert the rights advanced by this bill; and if it were necessary to pass on the point in the present case, we should be much inclined to hold that no act, or omission to act, on the part of the municipality with reference to obstructions in public streets, could in any case raise up an estoppel against it to proceed in the interest of the public to have such obstructions removed, however long they had been allowed to remain in the street.

This brings us to the final conclusion, that the respondents had originally no right to obstruct any part of Arch street, or to use any part of it as a private landing, or as a public landing not free of charge for the right to use it; and that no element of right has been injected into their claim by the efflux of time, or the direction and character of their occupation and use of a part of the street as their private property.

Several other questions are presented by the assignments of error. They are either not insisted on in the argument, or are fully covered by the exhaustive opinion delivered by this court through Mr. Justice SOMERVILLE, when the cause was here on demurrer to the bill; and, seeing no reason to depart from what was then said, we re-affirm that decision throughout.—*Webb v. Demopolis*, 87 Ala. 659. That and the foregoing opinion embrace all the points of this controversy, and determine them all adversely to the appellants, entitling the complainant below to the relief prayed in its amended bill, and granted by the Chancellor; and the decree to that end is in all things affirmed.

95 137
96 268
97 312
97 353

95 137
103 168

95 137
113 652

95 137
f124 117
124 118

95 137
133 373

95 137
136 853
136 595

95 137
144 380