## DIVERSION OF LANDS TO OTHER THAN PUBLIC USES.

Common Pleas Court of Cuyahoga County.

CITY OF CLEVELAND V. CLEVELAND, CINCINNATI, CHICAGO &
ST. LOUIS RAILWAY CO. ET AL.

Decided, February 18, 1909.

*Ejectment—Lies to Recover Possession of Lands Irrespective of Ease-
ment for Certain Purposes—Facts Constituting a Dedication—Cor-
poration Formed for Particular Purpose Presumed to have Been
Dissolved upon Completion of its Purpose—Statute of Limitations
Runs Against Municipalities—Diversion of Lands to Other than
Public Uses not an Abandonment of Such Public Use, When—Ap-
propriation Proceedings to Quiet the Claims of Third Parties not
Binding on Party under which the Railway Holds Possession—Am-
biguous Title—Construction of Contract at Time of Making Con-
trols—Municipal Corporations—Riparian Rights.*

1. A city may maintain an action against a railway company under
   Section 5781, Revised Statutes, to recover possession of land of
   which the former has the paramount title and the latter an ease-
   ment for certain purposes therein.

2. A strip of land occupied by a street and public place from 1796 down
   to the recording of a town plat in which it was located as a street
   in 1800 and continued to be so used until 1814, when the town was
   incorporated as a village by act of the Legislature making reference
   to such plat and was so used in 1836 when the village became in-
   corporated as a city, if not a statutory dedication thereof, becomes
   dedicated as such at common law.

3. The Connecticut Land Company was a corporation for the particular
   purpose of disposing of the lands of the Connecticut Western Re-
   serve, and, having completed its business and adjourned *sine die* in
   1809, it will be presumed that such company was dissolved and
   that neither its stockholders nor their successors retained any in-
   terest in such lands, especially as to a certain irregular strip of
   sandy land then of no particular worth between a lake and high
   bluff upon which such company had platted a town, which strip
   they dedicated as a street thereof and which was the only access
   afforded the inhabitants of such town to the lake beach.

4. The statute of limitations runs against municipalities where the ad-
   verse occupation is by permanent structures excluding the public.

Hence, if railway companies occupied openly, adversely, and exclusively a strip of land dedicated as a street with their tracks, buildings, etc., recognizing no title except that of their own from 1849 to 1893, they would obtain a complete and absolute title to such land.

5. The city of Cleveland by its incorporating act in 1836, having been given authority to mark the boundaries of its streets; by act of 1837 (35 O. L., 65), a way to vacate its public places and streets; and by special act in 1844 (43 O. L., 3) having obtained express power to utilize a lake front strip, dedicated as a street, for other purposes, does not abandon the strip by such diversion of its uses so as to give railway companies occupying part thereof with tracks etc., title by abandonment, especially since, instead of permitting such railway companies to appropriate rights therein, the city entered into a contract granting the use of such lands for railway purposes, but reserving some control thereof.

6. Appropriation proceedings, instituted by railway companies occupying, as a right-of-way under contract with a city, a strip of land dedicated by the Connecticut Land Company as a street, against certain alleged claims of title by successors of the original grantors, to which the city was not made a party, do not bind the city—either upon the claim that the city was an unknown party, because it was a known party and as against such claims the railways claimed title and possession from the city—or upon the ground of color of title at the time of the contract with the city for such right-of-way, inasmuch as both railway companies and city regarded the latter as being the owner and occupier of such lands.

7. A contract, ambiguous as to title granted for a right of way for tracks, depots, etc., necessary for the operation of railways over land owned by a rapidly growing city, located at the confluence of a large navigable lake and river made accessible to shipping by government improvements, and valuable because of its natural terminal facilities to railways and shipping interests, will not be construed as bartering away all access to the lake, especially where such advantages were known and in partial realization at the time, with the anticipation of future benefits imminent. The mere fact that the city might have had power to grant away such rights can not control.

8. Railway companies for several years, and in litigation with other parties claiming adversely to them, having construed their occupation, under contract with a city for a right of way over certain lands dedicated to public uses, as that of a licensee of and recognizing the paramount right in the city, can not more than fifty years later claim title to such lands by adverse possession.

*James Lawrence, N. D. Baker,* City Solicitor, and *D. E. Morgan,* for plaintiff.

*E. A. Foote,* for C., C., C. & St. L. Railway Co.

*F. S. McGowan,* for L. S. & M. S. Railway.

*W. B. Sanders, W. C. Boyle* and *C. T. Brooks,* for the Pennsylvania Co. and Cleveland & Pittsburg Railway.

VICKERY, J.

I approach the decision in this case with considerable hesitancy, as the interests involved are so great and the questions of law are so complicated, and for that reason I have taken more time than I would ordinarily take in deciding a case. I wish to thank the counsel in the case for the manner in which they have·presented it to the court; their work has made the work of the court much less. I am not only hampered by the complications in the case itself, but it has been twice decided already by two very able courts—one, the United States Circuit Court, in *Cleveland* v. *Railway,* 93 Fed. Rep., 113; the other, in the United States Circuit Court of Appeals, in *Cleveland* v. *Railway,* 147·Fed. Rep., .171; and, after able opinions by each court it was remanded to this court for retrial, where it originally started in 1893. The United States courts having no jurisdiction, their opinions however valuable they may be, are consequently not binding upon anybody only so far as the reasoning of the able lawyers must appeal to another lawyer in reviewing the same facts.

It was said to me by a prominent lawyer of this bar, in no wise connected with this case, and in a no-offensive sense, that a common pleas judge would have his nerve with him, if he dared to decide this case for the plaintiff after two United States courts had decided it for the defendants. Be that as it may, it would be much easier for this court if he could bring himself to follow the reasoning of the two courts who have already passed upon this question. But, with all due respect to the two able courts who have already passed upon it, I can not bring myself to agree with their conclusions. I have no hesitancy in saying that, from a somewhat careful review of the record and the authorities, a decision could be rendered in favor of the defendants, based upon a much more logical and consistent theory than either of

those adopted by the two able courts above referred to.  Indeed Judge Hammond, in basing his decision for the defendants on the ground of appropriation, calls forth a remark from the reviewing court that such a position is not tenable; and they base their decision upon the ground that it was admitted by the pleadings that the defendants had some rights in the street, and, therefore, action in ejectment would not lie, because action in ejectment is possessory action alone, and unless possession could be given to the plaintiff, however weak the title to the property of the defendants might be, the plaintiff was not entitled to maintain its action.  To arrive at this conclusion it was necessary for the learned Circuit Court of Appeals to eliminate some Supreme Court decisions of the state of Ohio, and to finally say then that the United States court would not be bound to follow the decisions of the Supreme Court of the state.  While that might be true so far as the United States Circuit Court of Appeals is concerned, it certainly would not obtain with a court of common pleas; *it* would be bound by the decisions of the Supreme Court of the state.  So, the decisions of the United States Circuit Court and Circuit Court of Appeals can both be eliminated from the subsequent discussion only so far as they aid in reaching a decision; and it will be the duty of this court to take up this case as if it had never been transferred to the United States court.  And so, we will go back to the beginning.

This suit is brought under Section 5781, Revised Statutes, which takes the place of the old common law action in ejectment, that was done away with when the Ohio code took effect, July 1, 1853.  And it is brought to recover possession of the property known as "Bath street property," and being all that property lying north of the south line of Front street to the lake, bounded on the west by the government pier and the Cuyahoga river, and on the east by the west line of Water street and the west line of Water street projected.  Plaintiff alleging in its petition that it is entitled to the possession of the property described in the petition, which has been designated as the "Bath street property," and that the defendant company unlawfully keeps plaintiff out of the possession.  The various defendants file answers, admitting that they have possession of the property in

question, and denying that plaintiff has any title in, or right to the same. They admit that their possession is exclusive, which in legal effect amounts to an ouster. They then set up several affirmative defenses; first, that they had had possession of the land for more than twenty-one years before the commencement of this action, and are entitled to the exclusive right to use the same; whereby it is alleged this action is barred by the statute of limitations. Second, defendants also claim that plaintiff is estopped from maintaining this action by permitting the defendants to occupy said lands and to expend large sums of money on the same and in the vicinity thereof. And for a third affirmative defense, the amended answer of the Cleveland, Cincinnati, Chicago & St. Louis Railway Company, and answers substantially to the same effect by the other defendants are filed, in which they say that on September 13, 1849, said plaintiff for the benefit of commerce of the city of Cleveland and its inhabitants, and to furnish to the defendants ground bordering on the lake necessary for carrying on such commerce, and to provide for an interchange of business with each other, an agreement was entered into whereby F. W. Bingham, then mayor of said city and duly authorized by resolution of the city council, executed and delivered to the C., C. & C. Ry., the predecessor of the C., C., C. & St. L. Ry., the deed or contract by which, in consideration of the sum of $15,000 in the capital stock of the said company for which a certificate was issued to said city by said railway company, and for other considerations named in said instrument, the said city granted to the said railway company as fully and absolutely as said city, through the authorities thereof who had the power and legal authority so to do, the right to a full and perpetual use of their railway tracks, turn-outs, engines, cars and passenger houses, turn-tables, water tanks, with stations and avenues to and from the same, and all other appurtenances connected with the necessary use and working of said railway, and all the real estate described in the petition. By virtue of said contract, said railway company entered into possession of said property, laid tracks and other construction necessary to carry on its business; made valuable improvements thereon; and afterwards, it admits, that other railway companies entered

into the occupancy and possession of said ground, and no effort was made by said plaintiff to return said stock at the consideration so mentioned in said contract.

Plaintiff replies to the several answers of the defendants, and takes issue with the affirmative defenses set up by the defendants. And in respect to the legal effect of said contract of September 13, 1849, with the character of the possession by the defendants of the premises in controversy, plaintiff admits the execution of the contract of September 13, 1849, by the then officers of the city of Cleveland, and the receipt and retention by it of the consideration therein mentioned. It denies the legal effect claimed for said instrument, and denies that either of them were, by the laws of the state of Ohio, then in force in the city of Cleveland, or that its officers had authority to grant exclusive rights to the lands embraced in said streets or the additions thereto.

So, the issue to be determined is, who is entitled to the possession of the land in question? That raises several questions. I will dispose of them in their order. It seems that the Connecticut Land Company, in about 1796, laid out the town of Cleveland by their surveyors, Pease and Porter, who furnished a map of their survey, the full notes of which and the original map being in evidence in this case; and the map shows in it "Bath street" as being all that part of the property in question which was north of lot 291 down to the lake; that portion which is west of the west line of Water street to the Cuyahoga river. It at that time was an irregular strip of land located between the bluff and the lake, and was a sandy strip extending to the westward, into a tongue of land projecting from the Bath street strip way off into the river. Subsequently, perhaps in 1826, the United States government had a channel cut across this strip, and a part of the land that was originally Bath street is now on the west side of the river, on Whisky Island, so-called.

The first question to be determined is: Did the city of Cleveland ever acquire title to Bath street, and if so, what title did they acquire in the street?

On December 6, 1800, the territorial Legislature of Ohio passed an act to provide for the recording of town plats. Thereupon

the Connecticut Land Company caused another plat and survey to be made by Amos Spofford, the surveyor. This plat and minutes and notes were duly recorded and has ever since been recognized by the land company and all claiming under it, as a correct plat of the village of Cleveland as laid off into roads, streets, alleys and public places.

It is worthy of note, that the only place of access to the lake for the inhabitants of the proposed new village or town was over this strip of land, formerly Bath street. The western boundary of this proposed town was the Cuyahoga river; the northern boundary was the lake; the street farthest east was Erie street, and the street farthest south was Huron street, with Ohio street running into that from the southeast. The lots along Lake street butted on the lake, so that the only place that access to the lake was had was at the confluence of the Cuyahoga river with the lake, along this little sandy strip of land called Bath street.

It is hard to conceive that the founders of the city of Cleveland did not intend to have some point of the proposed city reach the lake. The fact that this street was called "Bath street" seems to be significant as it was, undoubtedly, the only piece or strip of sandy beach suitable for bathing at that time, bordering upon the new city. And, undoubtedly, it was the intention of the founders of the city of Cleveland to have Bath street extend from lot 291 to the low wave mark at the lake. It was thus planned on the plat of the Pease & Porter and again on the Spofford map of 1800. The making of this last map was probably to comply with the statutes, which statutes (1 Chase's Stat., 291) provided, among other things, that "if the plat is acknowledged before some officer who was duly authorized to take acknowledgments, it at once placed the fee of the streets and alleys in the county for the benefit of the public." This map was recorded in the records at the county seat of Trumbull county, of which Cuyahoga county was then a part. But it was never acknowledged. There can be no question but what this strip of land was occupied as a street and a public place from the time of the platting of the city by Pease & Porter, in 1796, down to the recording of the map of Amos Spofford in

1800, and was still occupied when the village of Cleveland was incorporated by an act of the Legislature in 1814, which made special reference to the plat recorded in the recorder's office of Cuyahoga county. And there can be no question but this operated as and constituted an acceptance by the city of Cleveland, the then village of Cleveland, of this street for street purposes. And there can be no question but that the people in the village of Cleveland occupied and used this street up to the incorporation of the city of Cleveland in 1836. It was recognized as a street by an act of the Legislature in 1815, when the General Assembly of the state of Ohio recognized the city plat by vacating a part of it. 13 O. L., 114.

Again, in 1837, the General Assembly enacted, that all streets and alleys in towns which have, or may be laid out agreeable to all, shall be, and they are hereby dedicated public highways for every purpose whatever. Section 10 of the act of March 20, 1837 (35 O. L., 65) ; Swan's Stat. (1841), 809.

So, I say, there can be no doubt but that this street was dedicated. If not a statutory dedication, there was a common law dedication, and when the city of Cleveland was incorporated in 1836 (34 O. L., 271), this was one of the streets or public places in said city, and had been occupied as such without any question or claim from anybody to the contrary down to 1836. Surely, if for no other reason, the statute of limitations would have given the people of the city of Cleveland absolute right to use this street for street and public purposes.

It seems that the title to the land in the Connecticut Western Reserve, of which Cuyahoga county and the city of Cleveland were a part, was in three trustees, and as early as 1809 proper proceedings had been had by the members of the Connecticut Land Company to divide up all their holdings and to wind up their business absolutely, as it was a corporation incorporated for a particular purpose, to-wit, that of disposing of the land of the Connecticut Western Reserve, and for no other purpose; and when they had completed their business they adjourned *sine die.* And it is safe to presume that they retained no interest to this strip of land at least. And it may be safely said that if they ever had any title to this strip of land called Bath

street, they would have lost it by abandonment.   There can be no question but that the littoral proprietor is entitled to the accretions which may result, and which, in this case, did result from the building of the government pier along the Cuyahoga river; and the strip of land which, originally, was from sixty to three hundred feet in width had become very, very much wider in 1836.   And it can not be claimed that the Connecticut Land Company obtained title to any of these accretions, for they all belonged to the city of Cleveland by virtue of its having a street called Bath street, whether the dedication was statutory or was by common law.

The case of *Webb* v. *City of Demopilis*, 95 Ala., 116 (21 L. R. A., 62), is a very instructive case and in many ways parallel with the case at bar, but particularly instructive on the question of dedication.   So I have no hesitancy in saying that the city of Cleveland had acquired all title in and to the strip of land in controversy prior to 1836, and that no one else had, or could have, any right or title to it by virtue of any deeds, or by inheritance from the trustees of the Connecticut Land Company, or their heirs at law of any of the parcels of the land embraced in the Connecticut Western Reserve.   And, I think this title remained in the city, undisturbed and unassailable, down to the making of the contract of 1849, to which I will come subsequently.

The next question I will take up is: Is the nature of the city's interest and title in, and to, this strip of land such that they can maintain ejectment suit to recover possession?   There could be no question about this, if they were claiming to absolutely oust the railway companies from possession.   A great number of authorities are cited, many of which I have read, and it seems to be the overwhelming weight of authority that the city or municipality might maintain ejectment to recover possession of one of its streets, even though it is not seized of the fee.   But the question arises whether that could be done, where, as in this case, the city admits that the railway companies had the right to occupy this strip of land for some purposes.   I have not been able to learn just exactly how much the city admitted the railway companies have the right to occupy; but, I believe it is conceded that they have the right to occupy some portion,

and that there is no attempt made in this action to completely oust the railway companies in their occupancy. This makes it a little difficult to decide whether or not ejectment will lie in favor of the city. It is claimed by counsel for the city that the city has the right to recover possession of the property, subject to the easement that the railway company may have to use the land for some purposes. And they seem to be borne out by the authorities on this proposition.

I must confess that I am at a loss to know just what form of judgment might be entered in this case, if a finding should be made in favor of the city and against the railway companies, holding that the city is entitled to a paramount title and the railway companies only to an easement.

As I have already said, this action is brought under Section 5781, Revised Statutes, and the admissions of defendants do away with the necessity of proof of an ouster, because they deny title in plaintiff and also the right of possession. *Grant* v. *Paddock,* 30 Or., 312.

Judge Dillon says a municipal corporation is entitled to the possession and control of streets and public places, and may, in its corporate name, recover the same in ejectment. Where it possesses the fee, although in trust for public uses, there are no technical obstacles in the way of maintaining such an action against the adjoining proprieter or whoever may wrongfully intrude upon the occupancy of the detained property. And where the adjoining proprietor retains the fee the courts can overcome the technical difficulty by regarding the rights to the possession, use and control of the property by the municipality as a legal and not a mere equitable right. 2 Dillon, Municipalities (4th Ed.,), Section 62.

Again, where a valid dedication of the street has been made either statutory or according to the common law, an action may be maintained by the proper municipal authorities to recover possession from the one who wrongfully withholds it. *Fulton* v. *Mehrenfeld,* 8 Ohio St., 440; Newell, Ejectment, Sections 20-21, and other cases; also *St. Louis* v. *Railway,* 114 Mo., 13.

Judge Hammond, in this very action, *Cleveland* v. *Railway, supra,* page 117, where he distinguishes many of the cases cited by the defendants in this action, comes to the conclusion that

ejectment will lie.   I am constrained to hold with him upon this proposition, that the city could have the right to maintain eject-ment of·the land in controversy, subject to whatever rights the railway company may legally have in the tract of land, unless the city has parted with all of its title or is estopped by subse-quent actions to reclaim the land.   Whether the city has parted with its title or has estopped itself from setting up its title, I will take up subsequently.

The defendant company claims that they have occupied the land in controversy under a claim of ownership, absolutely and adversely, for a period of well nigh half a century, and that the statute of limitations has run in their favor, and the city of Cleve-land can not, at this time, disturb them in their possession.   That brings me to the question as to whether the statute of limitations runs against a municipality.   And I want to say on this ques-tion that I have reviewed the authorities, and I believe the ar-gument of Mr. McGowan on behalf of the Lake Shore road is absolutely unanswerable, and that the statute of limitations does run against a municipality as well as against anyone else.   Begin-ning with the case of *Cincinnati* v. *Church,* 8 Ohio, 298, decided in 1838, down to very recently, there is an unbroken line of au-thorities, all of which are to the effect that by the occupancy of the highways or common places by a structure which is perman-ent in its nature and of such a character that it would exclude the public from occupying that part of the highway and that it had existed for a period longer that the statute of limitations, to-wit, twenty-one years, the public would lose their right in and to that portion of the highway.   I think the cases which seem to hold differently than that are easily distinguishable, and it does not destroy the doctrine laid down in Ohio.

There has been cited the decision of Judge Caldwell of the cir-cuit court of this circuit in *Wright* v. *Oberlin,* 3 C. C.—N. S., 242.   Not wishing to criticise or comment upon this case I will only say that the circuit court in Lucas county, in the case of *Seese* v. *Maumee,* 7 C. C.—N. S., 497, reviewed the prior de-cisions of the Supreme Court and came to the conclusion that the statute of limitations does run against a municipal corporation where there is an entire exclusion of the public from the streets for a period of twenty-one years (it makes no difference how frail   .

or unsubstantial the barrier may be that excludes the public);
that is not necessary to exclude them by a permanent structure
but it is sufficient that the public be excluded.    And the court
say : .

"We think that this distinction was lost sight of by Judge
Caldwell when he came to decide the case of *Wright* v. *Oberlin*,
3 C. C.—N. S., 242, and *Morehouse* v. *Burgot*, 22 C. C., 174, but
that the distinction was recognized in the case of *Mott* v. *Toledo*,
17 C. C., 472."

And so I think there is no doubt, from the trend of the au-
thorities in this state, that the statute of limitations does run
whenever there has been an exclusive, open and adverse posses-
sion for a period of twenty-one years or more.    Just when the
statute would begin to run becomes a very important question.
If the original entry amounted to a disseizin, why of course the
statute of limitations would begin to run from the very entry
of the person claiming under the statute of limitations.    In the
case of *McAllister* v. *Hartzell*, 60 Ohio St., 69, the court held
that the statute of limitations did not run unless the, possession,
which in time might prove a full defense against the holder of
the record title, was actual, open, exclusive, continuous and ad-
verse.    In that case the possession in the first instance amounted
to a disseizin of the plaintiff, and hence the statute commenced
to run from that period, and the question there is as to what acts
of the defendant or what admissions of the defense would in
effect toll the statute; and they held that neither a mere offer
to buy within twenty-one years, nor acknowledgement by the
claimant within that time that the title is in another, nor that
the claimant does not own, the land, will have that effect.    That
case is relied on by the defendants in this action to do away with
the admissions contained in the answers in *Holmes* v. *Railway*,
93 Fed. Rep., 100, which I will refer to hereafter.    It is sufficient
at this time to call attention to the fact that in *McAllister* v.
*Hartzell, supra*, the original entry differed very materially from
what it does in this case, and the decision of the court goes only
to the effect that where the original entry is a disseizin, then, in
that case admissions by the defendant that they did not own
the property would not interrupt the running of the statute.
That distinguishes it from this case, as I will endeavor to show

hereafter. But there can be no question that if the railway companies have occupied this strip of ground openly, adversely and exclusively, recognizing no title except that of their own from 1849 down to 1893, when this suit was commenced, they would have a complete and absolute title to this ground and the city could not maintain this suit.

That brings us to the question as to how the railway companies obtained possession of this property. They set up various sources of title, and I presume if they have a good title by any of them it will be sufficient for this lawsuit. Eliminating for the time being the contract of 1849, let us see what the defendants claim: They claim, first, that the city abandoned this property and they got their title by abandonment; that it had ceased to occupy said property for street purposes when in 1844 they allotted a portion of it, when Silas Merchant made a map or plat of the Bath street property and laid out Commercial street and some other streets and cut Bath street down to a width of one hundred feet, and the city, in pursuance with an act of the Legislature that was passed in 1844 leased out certain portions of this, the property of various persons for various purposes.

It is difficult to understand how it can be claimed that there was an abandonment of this property. Under the act incorporating the city of Cleveland in 1836, the city of Cleveland was given authority to mark the boundaries in its streets and the law was either then passed, or shortly afterwards was passed, which provided a way in which streets and public places might be vacated, and the city had full power under this act of 1836 to vacate or abandon the property for street purposes if it saw fit. Not desiring to act under the broad authority given under this act of incorporation and the methods provided for by statute as to how streets shall be vacated, they sought authority from the Legislature, which was given them by the act of December 21, 1844 (43 O. L., 3), to temporarily utilize this property for some other purpose. They evidently having in mind the idea of the original proprietors of the town that there should be some means of communication with the lake, and the only means provided being over Bath street, it seems that the authorities of the city of Cleveland, in 1844, desired to keep this for the public and were

careful not to take the steps that would result in permanently vacating this property for street purposes, for in the act of 1844—which was an amendatory act to that of 1836 which incorporated the city of Cleveland—it was expressly provided that the city council of the city of Cleveland shall have full power and authority to construct wharves, docks and slips upon or in any portion or portions of the streets of said city adjacent to the Cuyahoga river or Lake Erie, reserving free from obstruction such portions of said street as shall, in their opinion, be required for public use.

Section 2 of act 43 O. L., 3, provides that said city council shall also have full power to lease any portion or portions of said street not in their opinion required for public use, or any wharves, docks or slips constructed upon or in the same, upon such terms and for such periods, not exceeding ten years in any one lease, as ·to them shall seem expedient, and all rents and profits accruing from said lease shall be set apart in a fund for improving the wharves and streets of said city.

Now, I can not conceive how, when the city got this authority to so use a portion of its streets, and the fact that they did lease portions of them out under the authority of this act—I say, I can not conceive it to be possible that it should be regarded as an abandonment of its right in the street.  As I have already said, no part of the city of Cleveland belonging to the public touched upon Lake Erie except over Bath street, and it must have been Bath street that was in mind when this act was passed. Indeed, I think it absolutely conclusive that the act was passed for no other purpose than to enable the city to temporarily occupy a part of this street, which had grown to be quite a stretch of land, for purposes other than driving over it and using it as a street, having in mind always that the occupancy was only to be temporary; and I think the reason why they chose to have a special act of the Legislature rather than to act under the powers given under the. act of incorporation, is conclusive that they did not intend to abandon the street or to vacate it but to keep their title for the public, so that when it was necessary it might be reclaimed by the public.   Hence, there having been no abandonment, the railway companies or nobody else could acquire title in this way.

It is next claimed that the railway companies acquired this land by appropriation. And, indeed, the learned circuit court of the United States, overruling all other contentions of the defendants, finally found in their favor, upon the theory that there had been an appropriation of this land. It is true that appropriation proceedings were taken by the railway companies, or some of them. In fact, before the contract of 1849 a resolution had been passed to appropriate all of the property outside of a one hundred foot line. This was in 1848. But that appropriation never went through, and the fact that it did not go through, that the city chose to make an agreement with the railway companies, shows that the authorities of the city had some purpose in their minds by which they might keep some sort of control over this property.

But the appropriation upon which the defendants rely—or rather the defendant, the Pennsylvania Railway Company and its predecessor in title—was not the appropriation proceedings that were contemplated by one of the railroads in 1848, but an appropriation to cut off some title that various persons were claiming, some by way of lease and others by way of deed from the trustees of the Connecticut Land Company, and others by deeds from the heirs of the former owners of the Connecticut Land Company—and the appropriation talked about was the appropriation to cut off the rights of these persons. The city was in no manner a party to that proceeding. It is alleged that the naming of unknown persons would include the city of Cleveland. That is not possible. The city of Cleveland was a known party; it could not be deprived of its property rights, if it had any, by proceedings in which it was not a party, and, indeed, the learned United States Circuit Court of Appeals, in criticizing the finding of Judge Hammond in the court below, held that such proceedings did not bind the city. However effective it may have been to those who were seeking title and tracing it back to the Connecticut Land Company, it could not be effective against the city. It is difficult to see upon what theory those claiming through Camp and Lloyd and those claiming through those from whom Holmes got his title could have any interest in this property whatever. Lloyd, when he saw that this property would be valu-

able and was greatly increasing from the accretions, undertook to get a title from the trustees, who were the holders of the naked legal title without any beneficial interest whatever, and in their deed to Lloyd they do not claim anything. They sold for a consideration received, quit-claimed any and all interest which they, as trustees, might have. If Lloyd got any title, he had no beneficial ownership; but from the time of the final meeting of the Connecticut Land Company in 1809 down to 1836, there was no claim from anybody that the Connecticut Land Company or anybody claiming through them owned any land located where this land is located, and it is difficult to conceive upon what theory the Lloyd title could be built up; and it would be of no importance in this action if it were not for the fact that that the Pennsylvania Railway Company through its predecessor in title claims to hold this entire strip of land by deeds from Lloyd and those who claim under Lloyd, and by appropriation and appropriate court proceedings to have acquired a color of title, and that they have held under this so-called color of title for a period of more than twenty-one years before the beginning of this action, and therefore, they say the statute of limitations is a complete bar to the city's right to recover. There can be no question but that if one goes into possession of property and holds it openly, adversely and exclusively for a period of twenty-one years, that title then ripens into perfect title. But when did this so-called color of title arise in this action? Was it subsequent to the contract of 1849? There can be no question but what in 1849 the city of Cleveland owned every inch of this property for street and public purposes; and there can be no question, from the evidence in this case, that the railway companies regarded the city of Cleveland as being the owner and occupier of this property when the contract of September 13, 1849, was made. Now, is it possible for the defendants to go into possession under a contract with the city of Cleveland? Assuming for a moment, for the sake of argument, that the city of Cleveland had not parted with its paramount ownership but still retained the right to control this tract of land subject to the rights given it by the railway company, is it possible, I say, they going into the possession of the property recognizing such a

right in the city, that they then can acquire color of title from other persons and when the city of Cleveland believed, and it had the right to believe, that the railway companies were holding under them; that by such color of title held for a period of more than twenty-one years they could oust the city of Cleveland from its rights over the property, and by adverse possession? I do not think the argument will stand for a moment, and the railway companies could not predicate their adverse holding upon color of title obtained from any other source than from the city of Cleveland itself.

I will repeat that in 1849, in my judgment, there is no question but what the city of Cleveland representing the public had the absolute right, title and interest in all the strip of land in controversy in this suit, and that no person or persons claiming through Lloyd or through Holmes or through any title derived from the Connecticut Land Company could successfully maintain their rights to the property. So, whatever rights the railway companies, the defendants in this action, have in that property is traced back to the contract of 1849, and the proper construction of that contract will determine the rights of the parties in this action.

If the contract of 1849 was such that it gave the railway companies the absolute ownership to this property, and they have occupied it from that time down to the beginning of this suit adversely, their title has ripened into a perfect title and they can not be disturbed, even though the city of Cleveland had no power to make the contract, even though it was an *ultra vires* contract, because the structures erected upon said ground would be of such permanent nature and the occupancy would be so exclusive that the statute would begin to run from the inception of the contract. So it becomes more and more important to examine into the whole question as to the circumstances under which this contract was made in order to judge of its force and effect. What was in the minds of the officials of the city of Cleveland, and what was in the minds of the officers of the railway companies when this contract of September 13, 1849, was made? There can be no question that in those days railway companies were regarded as a part of the public, and ocupancy of

public streets, public wharves and grounds by railway companies would be in accordance with the public use for which streets and other public places were dedicated.

It is claimed by Judge Lawrence on behalf of the city that the city gave the defendants rights to lay certain tracks but did not give them the right to erect depots, freight houses, turntables, etc., and, if I understand his contention, it is that, so far as the railway companies have occupied the property with this sort of structures, they are committing a public nuisance that can be abated at any time, or perhaps they are occupying under a revocable contract that was revoked by the commencement of this suit in 1893. If I were to agree with Judge Lawrence upon that contention. I could do no other than to find for the railway companies, on the ground that the statute of limitations was a complete bar. But I do not agree with counsel for the city, that this contract only gave them the right to lay certain tracks. I think a close scrutiny of that contract will disclose that the railway companies had the right to do whatever they have done with reference to the occupancy of that tract of ground; that they had the right to build turn-tables; they had the right to build passenger houses; they had the right to build freight depots. And, again, I say that if it was the intention of these parties to give absolutely all the rights the city had in this property without any string being attached to it, then I say the railway companies have occupied it in such a way and in pursuance of that contract that the statute of limitations is a complete bar against recovering any portion of the property.

But did the city of Cleveland intend to barter away its access to the lake? Did the city of Cleveland intend to give up all its rights over that which wharves might be built on Lake Erie on the public grounds of the city, and did the railway companies intend that when this contract was made the city should lose all right, title and interest in and control over this property? To get at this question necessitates an examination of all the surrounding circumstances, and everything which throws light upon the question ought to be examined, for in the proper construction of that contract must ultimately depend the rights of the parties.

If I am right in my contention that the city of Cleveland acquired title to this Bath street strip by dedication from the Connecticut Land Company in 1796 and subsequently, she maintained her rights in the strip religiously without any questions being raised down to 1836.

The government straightened the channel to the entrance of the Cuyahoga river in 1827. The census immediately following this date, to-wit, 1830, showed that there were 1075 people living in Cleveland, and the growth of the next decade showed a wonderful increase; and in 1850, just after this contract was made, the population of Cleveland was 17,074. Now, with this development of the city going on, it seems almost incredible that Cleveland would barter away her access to the lake so as to lose absolute control over it. It must have been perfectly apparent to anybody that this piece of property, located as it was at the confluence of the river and lake, would be the natural terminal facilities for such railways as might locate in Cleveland and would be the means of communication between the lakes and the railroads, from which two sources Cleveland would get all her commerce. Now, this being the situation, and this property having increased from a mere strip along the lake to an extent of over twenty acres, it actuated Lloyd to see whether or not he could not get some sort of a title to it, and, as I have already said, he procured a quit-claim deed from the trustees of the Connecticut Land Company; but he made no claim until very much later.

The city of Cleveland was incorporated, as I have said, in 1836, and it is important to notice the act of incorporation, for it is claimed by the Pennsylvania Railway Company, one of the defendants herein, that this act gave them the power to do whatever they subsequently did with this property, and that if the power was lodged in the city anywhere to make a contract, that the railway company could rest its rights upon that power. There can be no question but that in the act of 1836, Cleveland was made a body corporate and could contract and be contracted with and was given the control and custody of its streets, and had authority to make bounds to its streets and to limit them in any way it saw fit. Section 8 of that act (34 O. L., 271), provided a method of vacating streets or portions of streets. Sec-

tion 6, giving the council the right to establish and settle the boundaries of all streets or highways of all kinds within the city, and to prevent or remove encroachments thereon.    Section 8 also provided:

"The city council shall cause the public streets, roads, lanes, alleys and highways and the public squares and other public grounds that now exist within the limits of said city, to be, by the surveyor of the county of Cuyahoga, or some other competent surveyor, to be surveyed, described and permanently marked," etc.

So, had the city of Cleveland intended to vacate or abandon any portion of the Bath street tract, it had ample authority by the act of incorporation.    So when, in 1845, this land had grown by the accretions to be a large tract of land, more than was necessary for the immediate use of the public for street purposes, the city did not act under the act of incorporation but they sought by a special act of the Legislature, which was passed December 21, 1844, to which I have already referred, giving the city council the power to construct docks or slips upon any of the streets or places adjoining Cuyahoga river or the lake, and to lease out such portions as were not needed for street purposes for a term of years, not exceeding ten in any one lease, under and by virtue of which authority the Merchant plat was made and the thirty-one lots above alluded to were laid out, together with some streets giving access to the property.    Now, I say that the city council, seeking this authority by special act instead of acting under their general authority provided for under their act of incorporation, is a significant act and shows that the city of Cleveland did not intend to abandon this strip of land, but were temporarily using it and making leases for such terms so that they at any time could regain possession to make such use of it as they might see fit.    This was the situation when, in 1848, the Cleveland & Pittsburg Railway Company passed a resolution, by the board of directors, declaring it necessary to appropriate this Bath street tract, all except a one hundred foot strip on the south side that had been kept open by the Merchant plat for street purposes.    In the meantime those claiming through Lloyd had brought several ejectment suits against

the tenants of the city, contending that this Bath street strip, if it were dedicated, was dedicated for public purposes and in using it for any other purpose it would revert to the original owners, and Lloyd's quitclaim deed garnered up this title, and therefore Lloyd 'or those claiming under him were entitled to the reversion.

Or, it may be that his claim was that the accretions did not belong to the littoral owner but created a separate estate unattached; in other words, that the land under the water belonged to the Connecticut Land Company, and when the water receded its title would vest in the Connecticut Land Company, and hence in Lloyd. However this may be, Lloyd was making some claim to this property, and, indeed, had won an ejectment suit—just upon what theory it is difficult to discover—but he had won and the case was pending on some error proceedings in the Supreme Court of the state, while several other suits were still pending in the lower courts. This was the situation when the railway company made up its mind to appropriate. Under their charter they had the undoubted right to have appropriated this property. The city of Cleveland seemed to recognize this right, and it was possible then, as it is now, for the city to agree as to how the property should be held.

It has been contended in this litigation that the railway company could appropriate without the consent of the city. I think the United States Circuit Court of Appeals denies that right. However that may be, the city had the power to agree, and rather than to have them appropriate, they made the agreement of 1849, under and by virtue of which the railway companies went into possession of this ground and have occupied it ever since. Did the city of Cleveland prefer to have this contract made with the railways rather than to have them appropriate because they wanted to have something to say about the use of this property? The contract itself is ambiguous. Indeed, Judge Lurton, in his opinion, says that it is a most ambiguous contract. But irrespective of the construction that the parties themselves put upon it in the answers they file in the Holmes case, there are several things in the contract which are worthy of notice, and I believe that the contract must be construed strongly against the rail-

way companies and strongly in favor of the city, which represents the public. I believe this is in accordance with the unbroken line of authorities; that a grant from the public is construed strongly against the grantee.

It is claimed by the city in this action, by virtue of recent decisions, that an attempt of the city to deed away all the rights of the public in its public places is *ultra vires* and the contract is of no effect; that when they leased this property, if the contract of 1849 can be called a lease, their rights were limited to ten years, and then only for certain purposes; that everything in excess of that was void.

The railroad companies, on the other hand, claim that the power to dispose of this property in the manner that they claim it was disposed of, if not authorized by the act of 1844, it was by the act of incorporation of 1836.

But, coming back to the contract: Besides the consideration of $15,000, it is recited in the contract that the railroad companies, because the contract was made not only with the Big Four but for the benefit of the other companies who are now defendants in this action (or rather with their predecessors in title) should settle with Lloyd and Camp and those claiming through Lloyd and Camp and hold the city harmless, and for the purpose of making a settlement with Lloyd and Camp there is a very significant clause in the contract. It is as follows:

"And to enable said company to compromise and settle with the claimants Lloyd and Camp and all other claimants for the extinguishment of their claims to said premises or any part thereof, they may allow them to retain such portion thereof as may be necessary to effect such settlement, and it shall not be deemed necessary to be used for railroad purposes."

The force of the clause, to my mind, is convincing, that it was not intended by this contract of 1849 that this should operate as a sale of this property to the railway companies, for, if it were, it would not have been necessary for the city of Cleveland to give its assent to the transferring of part of this property to the Lloyd and Camp claimants. It seems to be regarded by the contracting parties to the contract of 1849 that in order that the railway companies could transfer a part of this property or au-

thorize its transfer, the consent of the city of Cleveland was necessary. Now, remember, that at this time it must have been perfectly apparent by the constant accretions that were going on that this was an exceedingly valuable piece of property, and that the city could have compromised with the Lloyd and Camp claimants by turning over a part of this property if it were necessary as well as to have authorized the railway company to do it, and they could have retained the balance themselves. The $15,000 in evidence that the railway company paid the city would not begin to be the principal sum on which they were receiving interest by way of rentals from the property by virtue of the leases made prior thereto, and it was constantly increasing in value; so the sum that was paid to the city was a mere trifling sum to what it was worth to the railway company, if the railway company's contentions are right.

But there are other things in the contract: one indicates that the city of Cleveland meant to keep control over the property. For instance, this clause (see *Cleveland* v. *Railway*, 93 Fed. Rep., 113, 140) :

"The said company shall not lease any part of the premises to any person or persons, company or companies, to be used for conducting or carrying on forwarding, storage, or commission business, or for the erection of warehouses thereon for the accommodation of such business; nor shall said company use said premises, or any part thereof, for the purpose of engaging in, accommodating, or aiding in the transaction of forwarding, commission, or warehousing business, with a view, either directly or indirectly, of deriving profit therefrom, nor shall they grant the right to any railroad company, person or persons, or other companies, so to do."

This clause indicates that the city of Cleveland retained some control over the property and limited the holding of the railway companies.

There is still another clause, which is as follows (page 139) :

"Said company shall take and hold the same subject to all legal claims, either in law or equity, of any person or persons, company or companies; it being expressly understood that the city does not guaranty or warrant either the title or the right to occupy the same, the said railroad company to have all the

money compensation, interest, benefits and rights which the city could in any manner be entitled to on account thereof.''

Now, it seems to me that what the city of Cleveland and the railway company undertook to do in that contract was:  Here was a great strip of land that was dedicated to the public for public uses and that was suitable for railway terminals, and that it would not be in violation of the purpose for which the street was dedicated to permit railroads to occupy this property, but it was to be occupied subservient to the paramount right of the city.  The city was to have the title and to retain it, and the contract was in the nature of a perpetual license for the railway companies to occupy under certain restrictions; and I have no doubt that the city thought and the railway company thought that the holding of the railway company was to be in this way, and the property that was made by subsequent accretions was to be the property of the city, and, if the railway company occupied it, it was to be under the terms of the original contract.  With this understanding as I conceive it to be, the railway companies went into the occupation of this property shortly after 1849.  They subsequently, by virtue of their agreement with the city of Cleveland, settled in various ways with the Lloyd and Camp claimants—some by contract and some by appropriation—perhaps two or three years after the contract was made, the entire strip in controversy by deeds and appropriation, so that they acquired from other sources the entire paper title to the entire strip in controversy; and now they claim that was color of title, and they have been holding under that ever since and it has ripened into perfect title by adverse possession at least. I have already referred to this, and suffice it to say, at this point, that I do not believe they can dispose of the city's title in this way by a title thus acquired subsequently to going in under a contract with the city.

But we are not left to a construction of this contract to be made more than fifty years after the contract was drawn. Shortly after it was made the parties themselves put a construction upon this contract.

In 1854, in the United States District Court of the Northern District of Ohio, an action was brought by Henry Holmes, Julius

C. Sheldon and others on behalf of themselves and other heirs of the stockholders of the Connecticut Land Company to recover this land, and all the railway companies now defendants, or their predecessors in title, were made parties defendant. The plaintiffs alleged that the railway companies were occupying the premises through a title obtained through Thomas Lloyd, and that Thomas Lloyd fraudulently procured a deed from the trustees of the Connecticut Land Company conveying the land claimed in the suit, and that the defendants were in possession of the land under a title made from said Lloyd with notice of the trust and the fraud. The prayer of the bill was to set aside the fraudulent deed, dissolve said trust and have a partition of the said land and an account of the rents and profits thereof derived from the defendants.

It would have been sufficient for the railway companies to have denied the title of the plaintiffs and have gone into that suit and beaten the plaintiffs because of the weakness of the plaintiff's title, for it was held by the learned Judge McLean in that case, that the plaintiffs had no title to this property in any way, shape or manner, and held that Lloyd had no title to the property in any way, shape or manner. But the defendants were not content with doing that. They, by their answers filed shortly after the contract of 1849 was made, when the circumstances surrounding the transaction were fresh in the minds of all, construed this contract, and they denied that they held this land from Lloyd, or from ony one save the city of Cleveland.

Judge McLean, in the case of *Holmes* v. *Railway, supra,* page 102, summarizes the defenses set forth in the answers of the defendants in that action as follows:

, "The defendants insist that the title to all of said land covered by the water of Lake Erie is in the public, and not in any trustee· for them"; (Let me say by way of parenthesis, it embraced not only the land already made but a certain amount of land under the water of the lake. I believe their claim extended to the Canadian boundary. And let me say in passing, that the railway companies had appropriated or acquired from Harbaugh a strip of land covered by water from a point so many feet south of the low water mark of Lake Erie where it touches Bath street to the Canadian boundary.) "and as to the residue of said land,

rely for a defense upon the equitable bar furnished by lapse of time, want of title and equity in the complainants and upon a dedication of said land to the public by the Connecticut Land Company as early as 1796, accepted immediately thereafter, and ever since used in accordance with the purposes of the dedication. They deny that they are in possession under the title derived from said Lloyd, and aver that they are in possession, under the authority of a statute of the state of Ohio, in pursuance of a license granted by the city of Cleveland, and using the same in manner consistent with the original dedication."

The answer itself, after reciting its corporate capacity, and the *termini* of the road, says, page 145:

"It being necessary to connect the same with the waters of said lake and river within the limits of said Bath street for the delivery of freight and passengers, and exchange of freight and passengers with other roads, and with the water craft navigating the said lake and river, and the same being also a suitable place for the terminus of said railway within said city, this defendant, under a license obtained from said city of Cleveland on the thirteenth day of September, A. D. 1849, has laid down in proper manner and not otherwise its railway tracks upon said Bath street, as shown in said diagram, and in such manner as to connect its railway with the waters of said lake and river. And this defendant is now, and for some time past, has been running its railway carriages in connection with said Cleveland, Painesville & Ashtabula Railroad Company upon the tracks so laid down to and from said river and lake, for the purposes aforesaid, in a prudent manner, at reasonable times, and so as to work no inconvenience to other legitimate uses of said street."

This characterizes the manner in which the railway companies went into the possession of that property, and how they were holding the property when this suit was tried. The suit was pending from 1854 until it was finally decided in favor of the railway company in 1861, and it is admitted in this action that the character of the occupancy of the railway companies was the same then that it was in 1893, when this suit was brought. If the city of Cleveland had been a party to this suit, the railway company would have been estopped from disputing their manner of holding this property. As it is, I do not think they are estopped, but the construction that the railway companies placed upon this contract at that time is, to my mind, consistent with the

entire contract, consistent with the condition of the law at that time, and consistent with the evident purpose of the city of Cleveland in making the contract.

The learned Judge Hammond, who first tried this case in the United States court, held that this recitation in this answer as to how the railway companies held this property, was absolutely conclusive upon them. I do not believe it. He then decided that by a subsequent appropriation proceeding, to which the city of Cleveland was not a party, they acquired possession, and so decided the case against the city.

If the railway companies had acquired this property from any other source that would give them a good title, I don't believe the answer would estop them from showing it. But the answer, to my mind, shows that from 1854 down to 1861 they were occupying this property as a licensee of the city of Cleveland, recognizing the paramount right to be in the city; and the importance of this is that it distinguishes this case from the case of *McAllister* v. *Hartzell, supra,* as to the time when the statute of limitations begins to run, as well as to distinguish this case from that as to what declarations will toll the statute. In that case the original entry was a disseizin, and the court holds that where such is the fact, the mere admission of the defendants that they did not own the property, or that some other person does, will not toll the statute.

Now, if the railway companies went into possession as the licensee of the city of Cleveland, their holding was not adverse, and the statute of limitations would not begin to run, and I say it distinguishes this case from *McAllister* v. *Hartzell, supra.*

As I have shown, the railway companies could not rest their title upon any source other than that of the city of Cleveland. Now, in my judgment, under this contract of 1849 they did not go into possession absolutely, exclusively, adversely, but they went in recognizing the paramount title of the city of Cleveland, and they continued to recognize that title down to 1861, when the Holmes case was tried; and there is not a scintilla of evidence in this record to show that they disputed the title of the city of Cleveland until 1893, when they filed their answers in this lawsuit. And if the character of the holding and their occupation

was the same when the Holmes case (in 1861) was tried as it has remained ever since, when did they begin to hold adversely?

It is perfectly apparent that if one builds a permanent structure which would exclude the public from the premises, then that would be notice to the world that the builder of that structure intended to hold it adversely, unless he admitted that he held it in some other way; and in their admissions in this answer in the Holmes case they admit in what manner they held this property, and consequently the building of permanent structures would not be an adverse holding. And, in my judgment, there was no adverse holding, no exclusive holding under a claim of ownership as against the city until this suit was started and the answers were filed in this action; and if the answers had set up the same sort of a defense that they did in the Holmes case, the city of Cleveland would have been defeated in its actions here, because the railway companies had the right to occupy in the manner that they have occupied by virtue of that contract. But when they undertook to deny all right to the possession by the city of Cleveland and all title to the city of Cleveland, alleging that they owned it absolutely, it amounted to an ouster, and, unless they have acquired rights other than the contract of 1849 gave them, they have no right to oust the city of Cleveland of whatever rights the city retained in that property by virtue of the contract of 1849.

I know it is claimed that the answer in the Crawford and Price case that was filed by the city is sort of an admission by the city. I do not think that the answer will bear that construction exactly, and the answer of the city is perfectly consistent with the interest that I conceive that the city retained in this property. They recite, among other things, after reciting the suits that have been started by Lloyd and Camp, etc.:

"That it was the interest and wish of the respondent to get clear of all controversies whether legal or otherwise, and for that reason this respondent was unwilling to have said company obtain possession of said property by the power given them by their charter, but proposed and believed it to be for the interest of this respondent, and for all parties having any interest in said property, to make an amicable arrangement by which said company might be invested by all the rights of this respondent in said

property.  Upon these views, this respondent being compelled to transfer to said company said property, and preferring to do so under a negotiation, than to have it taken under and by virtue of said company's charter and appropriation, and desirous of avoiding all controversy with said company, for the convenience and advantage of this respondent the said negotiations and contract were made between the company and the respondent.''

This is perfectly consistent, and, indeed, strong evidence that the city did retain an interest in this property; otherwise, why would they want to preserve the interest of whom they represented in the property, to-wit, the public?

Again, quoting from the answer:

''Respondent admits it to be true that, by the terms of the contract between the city of Cleveland and said company made on the thirteenth day of September, 1849, as aforesaid, said company took the interest of said city in the said Bath street property subject to all the rights and privileges of all other persons which would be legally enforced against the property had the city continued to hold the same. and also assumed all the legal liabilities to other persons which rested on the city in the relation to said property, up to that time.''

Now, taking the whole answer to the Price and Crawford case, I think it is consistent with the construction, in accordance with the views I have herein expressed.  The learned United States Circuit Court of Appeals put something into the contract of 1849 which was not there, that is, that the railway companies were to have exclusive occupancy of this property.  I have read the contract with much care several times, and I can not find those words.  I know it is alleged that the word *occupy* means to exclude.  That depends upon the manner they occupy, whether they recognize a paramount title or not.  As I claim, that has been recognized by the railway companies in this case.

Much light has been thrown upon the character of this case by later decisions of our Supreme Court.  As to just how far they would affect the rights of the defendants in this action if there had been an earlier construction placed upon these statutes which is contrary to the present construction, I do not deem it expedient to discuss, since, in the view I take of this case, it does not make any difference.

I therefore hold, that the city of Cleveland is entitled to maintain an action in ejectment in this suit to recover possession of the property, subject to the railways' right of easement in the property.

The railway companies by a disclaimer disclaimed any right to the 132-foot strip on the south side of the tract of land described in plaintiff's petition, as well as the strip along the river. That portion is eliminated from consideration.

I have said before that there may be some difficulty in drafting judgment to meet the requirements of this case; but in *St. Louis* v. *Railway*, 114 Mo., 13, it is decided that the fact that a railway company may have a vested right to the use of one or more tracks upon the public street will not constitute a bar to an action in ejectment from the street by the city, where the company denies the city's title. The reciprocal rights of the parties in such a case can be defined in the judgment.

And so I say, the decision will be for the plaintiff, the city, to recover all that portion of Bath street not covered by the disclaimer in the answers of the defendants.